UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| CORY BLANKENSHIP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO.   3:19-cv-146 |
| | ) | |
| METROPOLITAN GOVERNMENT OF | ) | JUDGE RICHARDSON |
| NASHVILLE AND DAVIDSON | ) | MAG. JUDGE FRENSLEY |
| COUNTY TENNESSEE, | ) | |
| | ) | JURY DEMAND |
| Defendant. | ) | |

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY AND ON AFFIRMATIVE DEFENSE OF DIRECT THREAT

#### INTRODUCTION

In accordance with Rule 56 of the Federal Rules of Civil Procedure, plaintiff has moved the Court for a summary judgment in his favor on the issue of the liability of defendant to plaintiff for violation of the American with Disabilities Act, as amended (ADAAA), 42 U.S.C. §12112(a) and (b)(6). Summary judgment for plaintiff is appropriate because the defendant withdrew a conditional offer of employment it had made to plaintiff, and thereby denied plaintiff employment as a Fire Fighter with the Nashville Fire Department, for an unlawful reason: solely because plaintiff is a person with a disability, Type 1 diabetes mellitus, who had not had 4 hemoglobin A1C tests in the 12 month period preceding defendant's decision.  Plaintiff

also seeks summary judgment on defendant's direct threat affirmative defense.

Defendant's action was unlawful because it was based on the application of a qualification standard that screens out or tends to screen out persons with the disability of diabetes, but cannot be shown by defendant to be job-related and consistent with business necessity, in violation of 42 U.S.C. §12112(b)(6). In fact, even in the face of the opinion of plaintiff's retained expert, Dr. John E. Anderson, that the qualification standard at issue is not job-related and consistent with business necessity, defendant has not disclosed any expert to provide a contrary opinion. (Cowan Declaration at ¶2). As a result, there are no genuine issues of material fact and plaintiff is entitled to a judgment as a matter of law. In addition, defendant has no competent evidence to support its affirmative defense that plaintiff was a direct threat, and as a result, plaintiff is entitled to summary judgment on that affirmative defense.

In support of this Motion, plaintiff has filed the following record evidence:

1. The Declaration of plaintiff's retained expert, Dr. John E. Anderson (Anderson Declaration), with his attached expert Report (Anderson Report) and exhibits.

2. The Declaration of plaintiff's treating Endocrinologist, Dr. Michael J. Fowler.

3. Plaintiff's Declaration.

4. Excerpts of deposition of Dr. Michael Fowler.

5. Deposition of Dr. Gill Wright,[1] with selected exhibits.

6. Deposition of William Swann,[2] with selected exhibits

7. Declaration of Wade B. Cowan, with exhibit.

8. Certified transcript of the medical waiver hearing on plaintiff's request for a waiver before the Metro Nashville Civil Service Commission ("CSC") on January 9, 2018.[3]

## SUMMARY STATEMENT OF THE CASE[4]

Plaintiff is a person with Type 1 diabetes mellitus. (Anderson Report at ¶4). Plaintiff applied for employment with defendant for the position of Fire Fighter with the Nashville Fire Department in August 2017. (Complaint [Doc. No. 1] at ¶10; Answer [Doc. No. 9], at ¶10). In the application process, defendant made a conditional offer of employment to plaintiff, dated October 30, 3017. (Swann Depo. at 28-29; Swann depo. Exh. 2). One of the conditions of the conditional offer of employment was that plaintiff undergo a comprehensive physical exam. (*Id.*). In that process, plaintiff was medically

---

[1] Dr. Wright is defendant's Civil Service Medical Examiner. (Wright depo. at 9). He was the decision-maker in the decision to medically disqualify plaintiff. (*Id.* at 45-46).

[2] Swann is the Chief of the Nashville Fire Department, and as such is the highest-ranking official within the Fire Department, reporting to the Mayor. (Swann depo. at 5-6).

[3] The hearing was recorded on video and a copy of the video was made an exhibit to Dr. Wright's deposition. (Cowan Decl. at ¶3). Plaintiff's counsel had the hearing transcribed from the video by a court reporter. (Cowan Decl. at ¶3). Plaintiff has read and verified the accuracy of this transcript. (Blankenship Decl. at ¶7).

[4] A complete statement of the facts is contained in plaintiff's Statement of Undisputed Material Facts, which is filed with plaintiff's Motion for Summary Judgment in accordance with Local Rule 56.01(b).

disqualified by defendant's Civil Service Medical Examiner, Dr. Gill Wright. (Wright depo. at 9, 45-46). Plaintiff then requested a waiver from the Civil Service Commission (CSC) in accordance with defendant's Civil Service Rules. (Wright depo. at 45-47; Wright depo. Exh. 9, §8.3 [found at p. MG000912]). Dr. Wright recommended a "Medical Denial" of plaintiff's waiver request. (Wright depo. Exh. 3). The CSC held a hearing on plaintiff's waiver request on January 9, 2018 and accepted Dr. Wright's recommendation and denied plaintiff's request for a waiver. (CSC Transcript at pp. 14-15). Dr. Wright testified at the CSC hearing that if plaintiff had had 4 hemoglobin A1C tests in the previous 12 months, there was no reason that Dr. Wright could not recommend a medical waiver. (Wright depo. at 69; CSC Transcript at 6-7).[5] Because plaintiff had not had the 4 A1C tests over the previous 12 months, the Civil Service Commission upheld Dr. Wright's decision to medically disqualify plaintiff. (CSC Transcript at pp. 14-15).

Plaintiff's claim is that defendant violated the ADAAA by withdrawing a conditional offer of employment for the position of Fire Fighter in the Metropolitan Nashville Fire Department because defendant medically disqualified him from that position based on the application of a qualification standard that is not job related and consistent with business necessity. Defendant has asserted the affirmative defense of direct threat, and that

---

[5]    Even though the CSC hearing testimony was not under oath, Dr. Wright affirmed in his deposition that he told the truth in his CSC testimony. (Wright depo. at 67).

affirmative defense is not supported by any competent evidence and plaintiff is entitled to summary judgment on that affirmative defense.

The facts supporting plaintiff's Motion are set forth in the accompanying Statement of Undisputed Facts and below.

The material facts related to these claims are not in dispute, and as shown below, plaintiff is entitled to a judgment as a matter of law on the specified claims.

### PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE QUALIFICATION STANDARD USED TO MEDICALLY DISQUALIFY HIM IS NOT JOB-RELATED AND CONSISTENT WITH BUSINESS NECESSITY

### A. Summary Judgment Standards

Summary judgment is appropriate when the moving party demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

The initial burden is on the moving party to show an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citations omitted). The moving party may meet this burden by "pointing out to the district court [ ] that there is an

5

absence of evidence to support the nonmoving party's case when the nonmoving party bears the ultimate burden of proof." *Id.* at 325, 106 S.Ct. 2548. In order to avoid summary judgment, the nonmoving party may not rest on the unsubstantiated allegations contained in his or her pleadings, but is required by Rule 56 to go beyond the pleadings by way of affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *Id.* at 324, 106 S.Ct. 2548. Summary judgment should be granted where the party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

With respect to the sufficiency of the evidence provided by the nonmoving party, the court should grant summary judgment where the party's evidence is merely colorable, conclusory or speculative. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. There must be more than a scintilla of evidence supporting the nonmoving party's claims and more than some metaphysical doubt as to the material facts. *Id.* at 252, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

B.     **Statutory and Regulatory Language**

The applicable parts of the Americans with Disabilities Act, as amended, 42 U.S.C. §12112, state:

**(a) General rule**

No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

**(b) Construction** As used in subsection (a), the term "discriminate against a qualified individual on the basis of disability" includes—

...

**(6)** using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity;

42 U.S.C. §12113(b) states:

**(b) Qualification standards**

The term "qualification standards" may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace.

42 U.S.C. §12111(3) states:

**(3) Direct threat**

The term "direct threat" means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation.

Regulations promulgated by the Equal Employment Opportunity Commission (EEOC) define "qualification standards" as:

the personal and professional attributes including the skill, experience, education, physical, medical, safety and other requirements established by a covered entity as requirements

7

which an individual must meet in order to be eligible for the position held or desired. 29 C.F.R. §1630.2(q).

## C.    Defendant Is a "Covered Entity"

42 U.S.C. §12111(2) defines "covered entity" to include an "employer." 42 U.S.C. §12111(5) defines "employer" to be a "a person engaged in an industry affecting commerce who has 15 or more employees."   42 U.S.C. §12111(7) states that the term "person" "shall have the same meaning given such terms in section 2000e of this title."   42 U.S.C. §2000e states that the term "person" includes "includes one or more individuals, governments, governmental agencies, [or] political subdivisions …."   Defendant's Fire Department has approximately 1250 employees.   (Swann depo. at 7-8). Because defendant is a metropolitan government (Answer [Doc. No. 9] at ¶2) employing 15 or more employees, it is included within the scope of the term "covered entity" under the ADAAA by way of these provisions.

## D.    Plaintiff Is an Individual with a Disability

42 U.S.C. §12102 defines "disability" as follows:

**Disability** The term "disability" means, with respect to an individual—

**(A)** A physical or mental impairment that substantially limits one or more major life activities of such individual;
**(B)** a record of such an impairment; or
**(C)** being regarded as having such an impairment (as described in paragraph (3)).

**(2) Major life activities**

**(A) In general**

For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

**(B) Major bodily functions**

For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

There is no dispute that plaintiff is an individual with a "disability" under this definition. Specifically, the ADAAA's definition includes the operation or function of an individual's endocrine system within the scope of the term "major life activities." The expert Report of Dr. John E. Anderson establishes that plaintiff's Type 1 diabetes mellitus "is a physical impairment that substantially limits the operation of his endocrine system as compared to the average person in the population without Type 1 diabetes. The endocrine system is made up of glands that produce and secrete hormones, chemical substances produced in the body that regulate the activity of cells or organs. The pancreas is a part of the endocrine system. Mr. Blankenship's pancreas produces no insulin." (Anderson Report at ¶4). Defendant disclosed no expert to rebut or question Dr. Anderson's opinion; therefore, there is no

dispute of fact on the issue of whether plaintiff is a person with a disability under the ADAAA. (Cowan Decl. at ¶2).

**E.     Plaintiff Is a "Qualified Individual"**

The ADAAA prohibits discrimination against a "qualified individual." 42 U.S.C. §12112(a). A "qualified individual" is a person who can satisfy the perquisites of the job, in terms of skills or experience who can perform the essential functions of the job with or without a reasonable accommodation. *Branham v. Snow*, 392 F.3d 896, 904 (7th Cir. 2004). There is no dispute that plaintiff has the requisite underlying skills or experience for the position of Fire Fighter because defendant gave him a conditional offer of employment after the testing and interview phase of the hiring process. As a result, the question is whether there is any genuine issue of material fact on the issue of whether plaintiff could perform the essential functions of the position with or without a reasonable accommodation.

In *Bates v. UPS*, 511 F.3d 974 (9th Cir. 2007), the *en banc* Ninth Circuit made it clear that the "essential functions" of a position must not be confused with "qualification standards," which an employer may establish for a certain position. 511 F.3d at 990. "Essential functions" are basic or fundamental duties of a job. 29 C.F.R. §1630.2(n)(1). In contrast, "qualification standards" are "personal and professional attributes" that may include "physical, medical [and] safety" requirements. 29 C.F.R. §1630.2(q). As the Ninth Circuit recognized, "[t]he difference is crucial," because "[t]he statute does not

require that a person meet each of an employer's established 'qualification standards,' however, to show that he is 'qualified.' And, indeed, it would make little sense to require an ADA plaintiff to show that he meets a qualification standard that he undisputedly *cannot* meet because of his disability and that forms the very basis of his discrimination challenge. *Bates v. United Parcel Serv., Inc.,* 511 F.3d 974 at 990. As the Court in *Bates* pointed out, this conclusion is supported by the legislative history:

> One of the Senate committee reports states that the qualification standard section of the ADA was meant to apply to "a person with a disability [who] applies for a job and meets all selection criteria *except one that he or she cannot meet because of a disability.*" S.Rep. No. 101–116, at 37 (1989) (emphasis added). The legislative history also cites with approval *Prewitt v. U.S. Postal Serv.,* 662 F.2d 292, 306 (5th Cir.1981) (cited by H. Rep. No. 101–485(III), at 42) (1990) *reprinted in* 1990 U.S.C.C.A.N. 445, 446, a Rehabilitation Act case that adopted the same prima facie case standard adopted here. *See Prewitt,* 662 F.2d at 306 (requiring the plaintiff to prove as part of his prima facie case "that he is qualified for the position under all *but the challenged criteria*" (emphasis added)). 511 F.3d at 990, fn. 6.

In this case, plaintiff's treating Endocrinologist, Dr. Michael Fowler, certified during the medical examination phase of the hiring process that plaintiff was "well-educated and well-motivated in diabetes self-management and has achieved a level of diabetes management to be capable of safe and effective job performance as a fire fighter." (Fowler Decl. at ¶11; Fowler Decl. Exh. 2 at p. 5). Moreover, defendant has never claimed that plaintiff is unable to perform any of the essential functions of the Fire Fighter position, just that he cannot meet the qualification standard at issue. In the "Medical

Waiver Recommendation" he submitted to the Civil Service Commission as a part of plaintiff's waiver request, Dr. Wright did not say plaintiff was unable to perform an essential function of the position.[6]  (Wright depo. Exh. 3). Instead, he pointed out that Type 1 diabetes in a disqualifying condition under NFPA §1582.6.20.1 "unless certain criteria are met."   He then cites to Dr. Fowler's opinion that plaintiff's "adequate control of his diabetes and ability to perform the essential job functions of a firefighter," and concludes his recommendation for denial with the statement, "[t]he rick of hypoglycemia is increased by the use of insulin.  For this reason, the CSME recommends medical denial at this time."  *Id.*

Thus, because plaintiff has established, through his treating Endocrinologist, Dr. Fowler, that he can perform the essential functions of the position, the question becomes "whether the qualification standard used by the employer satisfies the business necessity defense."  *Bates v. UPS*, 511 F3d at 992.  As the Court in *Bates* held:

> when an employer asserts a blanket safety-based qualification standard—beyond the essential job function—that is not mandated by law and that qualification standard screens out or tends to screen out an individual with a disability, the employer—not the employee—bears the burden of showing that the higher qualification standard is job-related and consistent with business necessity, and that performance cannot be achieved through reasonable accommodation. 42 U.S.C. § 12113(a).  511 F.3d at 992-993.

---

[6]     And, of course, having 4 A1C tests in the previous 12 months is not an essential job function of a Fire Fighter.  (Wright depo. at 87).

**F.    The Sole Reason that Plaintiff Was Denied Employment as a Fire Fighter by Defendant Was Because Defendant Medically Disqualified Him**

Defendant's hiring process for the position of Fire Fighter was explained in his deposition by defendant's Fire Chief, William Swann.  Once a person applies there is a written exam and a physical exam that are scored, as well as an interview process. (Swann depo. at 27, 30-31).  The highest scorers are placed on a list for three years, and the hiring selections are made from that list.  (*Id*.).  Persons hired from the list receive a conditional offer of employment that requires a background check, drug screen and medical exam.  (Swann depo. at 29; Swann depo. Exh. 2).  Once these conditions are met, the person becomes an employee of defendant, classified as a Firefighter I, and enters a six-month training program.  (Swann depo. at 26-27).

Defendant made a conditional offer of employment to plaintiff, dated October 30, 2017.  (Blankenship Decl. at ¶4; Swann depo. Exh. 2).  Plaintiff successfully completed the drug screen and background check. (Blankenship Decl. at ¶4; Swann depo. at 29-20).  The only thing that kept plaintiff from being hired and entering the training phase as a fire recruit was the medical examination. (Swann depo. at 31).[7]

_____

[7]    The deposition question to Swann concerning what kept plaintiff from being hired used the term "physical examination" instead of "medical examination."  However, it is clear from the context and the record as a whole that the sole reason plaintiff was denied employment and entry into the training class was the medical examination.

**G. The Sole Reason that Defendant Medically Disqualified Plaintiff Was Because Plaintiff Did Not Meet the Defendant's Qualification Standard of 4 A1C Tests Within the Previous 123 Month Period**

As a part of the medical evaluation process for candidates for Fire Fighter, defendant has adopted "NFPA 1582" which is titled, "Standard on Comprehensive Occupational Medical Program for Fire Departments" promulgated by the National Fire Protection Association (NFPA). (Wright depo. at 60; Wright depo. Exh. 4). The NFPA is a private organization, and their standards do not have the force of law. (Wright depo. at 60).

Under NFPA 1582, candidates with Category A medical conditions "shall not be certified as meeting the medical requirements of this standard." (Wright depo. Exh. 4 at §6.2.2, found at p. MG 000561). Type 1 diabetes is considered to be a Category A medical condition, and therefore disqualifying, unless the candidate meets all of a list of 12 criteria. (Wright depo. at 68; Wright depo. Exh. 4, at §6.20.1, found on page MG000566). One of these criteria is that the candidate:

> Has a signed statement and medical records from an endocrinologist or a physician with demonstrated knowledge in the current management of diabetes mellitus as well as knowledge of the essential job tasks and hazards of fire fighting as described in 5.1.1, allowing the fire department physician to determine whether the candidate meets the following criteria:
>
> ...

14

ii. Has had hemoglobin A1C[8] measured at least four times a year (intervals of 2 to 3 months) over the last 12 months prior to evaluation …. (Wright depo. Exh. 4 at §6.20.1(g) and (g)(ii), found at p. MG000566).

When plaintiff was informed that he had been medically disqualified by Dr. Wright's office after the medical exam in the conditional offer of employment, he was told by a nurse in Dr. Wright's office that the only reason he was disqualified was that he had not had 4 A1C tests over the previous 12 months. (Blankenship Decl. at ¶5). At the Civil Service Commission hearing, Dr. Wright testified that if plaintiff met the frequency of A1C tests criterion, "he would meet all of the requirements then as laid out" and Dr. Wright would have "no reason that he could not recommend [plaintiff], recommend the exception." (CSC Hearing transcript at pp. 6-7). Dr. Wright confirmed this testimony in his deposition and said that if there had been 4 A1C tests in the prior 12 months, he knew of no reason he would not have recommended approval of plaintiff's waiver request. (Wright depo. at 59, 69).[9]

---

[8]    The A1C test is a measurement of the amount of glucose, or blood sugar, attached to red blood cells that last in the blood stream for approximately 3 months. (Anderson Report at ¶17). It is an average of the person's blood sugar levels over a 3-month period. (Fowler depo. at 52). Because a person's A1C changes extremely slowly over a period of 3 months, it is not reflective of daily blood sugar fluctuations nor does it provide any insight into the risk for hyper or hypoglycemia in a given individual. (Anderson Report at ¶18).

[9]    In his deposition, Dr. Wright added a qualifier to his CSC testimony, not present in the NFPA standard or in his CSC testimony, by saying that the A1C tests had to be "acceptable," which he defined as being below 8, with 8 or above being "abnormal." (Wright depo. at 69, 74). All the NFPA standard requires for an A1C reading at 8 or above is a further test to determine if there is another condition causing it to not "accurately reflect average glucose levels." (Wright depo. Exh. 4 at 6.20.1(g)(ii)).

In the medical examination process, Dr. Wright never stated that there was any specific essential job function of the Fire Fighter position that plaintiff was unable to perform.

As a result, it is undisputed that the frequency of A1C test standard set forth in NFPA §6.20.1(g)(ii) was the sole reason that Dr. Wright disqualified plaintiff.

## H.     The Frequency of A1C Tests Qualification Standard Is Not Job Related and Consistent with Business Necessity

Under 42 U.S.C. §12112(b)(6), unlawful discrimination under the ADAAA includes using "qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities[10] unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity." Thus, the law affords an employer an affirmative business necessity defense to claims challenging the application of an otherwise problematic qualification standard. *Bates v. UPS,* 511 F.3d at 992-993; *see,* 42 U.S.C. §12113(a). The *Bates* opinion sets out the proper analysis of the issue of whether an employer can satisfy its burden of showing that a qualification standard is job related and consistent with business necessity:

---

[10]     The frequency of A1C tests without question tends to screen out **only** persons with diabetes, because, as Dr. Wright recognized, if a Fire Fighter candidate is not a person with diabetes, that person is not required to have 4 A1C tests.  (Wright depo. at 87-88; Anderson Report at ¶14).

To show 'job-relatedness,' an employer must demonstrate that the qualification standard fairly and accurately measures the individual's actual ability to perform the essential functions of the job. *See Cripe* [*v. City of San Jose*]*,* 261 F.3d at 890; H.R.Rep. No. 101–485(III), at 32 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 454–55; *see also Belk v. Sw. Bell Tel. Co.,* 194 F.3d 946 (8th Cir.1999); *Hendricks–Robinson v. Excel Corp.,* 54 F.3d 685, 699 (7th Cir.1998). When every person excluded by the qualification standard is a member of a protected class—that is, disabled persons—an employer must demonstrate a predictive or significant correlation between the qualification and performance of the job's essential functions. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 431, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Cf. Clady v. County of Los Angeles,* 770 F.2d 1421, 1432 (9th Cir.1985) ("As a general principle, the greater the test's adverse impact, the higher the correlation which will be required.") (analyzing business necessity defense to Title VII disparate impact claim).

To show that the disputed qualification standard is "consistent with business necessity," the employer must show that it "substantially promote[s]" the business's needs. *Cripe,* 261 F.3d at 890 (quoting *Bentivegna v. U.S. Dep't of Labor,* 694 F.2d 619, 621–22 (9th Cir.1982) (interpreting the term "business necessity" for purposes of the Rehabilitation Act of 1973)). As we observed in *Cripe:* "The 'business necessity' standard is quite high, and is not to be confused with mere expediency." *Cripe,* 261 F.3d at 890 (citation, quotation marks and alteration omitted). For a safety-based qualification standard, "[i]n evaluating whether the risks addressed by ... [the] qualification standard constitute a business necessity, the court should take into account the magnitude of possible harm as well as the probability of occurrence." *EEOC v. Exxon Corp.,* 203 F.3d 871, 875 (5th Cir.2000) (noting that "[t]he acceptable probability of an incident will vary with the potential hazard posed by the particular position: a probability that might be tolerable in an ordinary job might be intolerable for a position involving atomic reactors, for example"). *Bates v. United Parcel Serv., Inc.,* 511 F.3d 974, 996 (9th Cir. 2007).

The undisputed facts establish that the qualification standard of 4 A1C tests within the 12 month period preceding the medical examination does not meet these tests.

First, the NFPA itself does not independently test, evaluate, or verify the accuracy of any information or the soundness of any judgments contained in NFPA documents.  (Wright depo. at 61).  Dr. Wright testified that he was unaware of whether defendant had ever undertaken independently to validate or verify the accuracy of the information and judgments contained in NFPA 1582. (*Id*.).   When asked by interrogatory whether it had ever validated these standards as being job related and consistent with business necessity, defendant provided no evidence that it had, and simply answered:

> You are referring to National Fire Protection Association ("NFPA") 1582 and the Civil Service Commission Meeting Minutes that have been produced.  Concerning validation, the Civil Service Medical Examiner reviews and uses NFPA 1582 when evaluating and examining fire recruits.  The Fire Marshall and the Fire Chief also are believed to be familiar with NFPA standards being job related and consistent with business necessity.  (Defendant's Responses to Plaintiff's First Set of Interrogatories [submitted as Exh. 1 to Decl. of Wade B. Cowan] at No. 7, pp. 6-7).

In other words, neither the defendant nor Dr. Wright, the Civil Service Medical Examiner who disqualified plaintiff, has ever validated or verified that the standard in question here is job related and consistent with business necessity.  Instead, according to defendant's interrogatory answer, Dr. Wright merely "reviews and uses NFPA 1582 when evaluating and examining fire recruits."

Since the issue of job relatedness and business necessity is an affirmative defense, *Bates v. UPS*, 511 F3d at 992, defendant has the burden of proof on that issue. Defendant has not disclosed an expert to rebut Dr. Anderson's opinion, set forth below. While Dr. Wright is a medical doctor who disqualified plaintiff, he was not disclosed as an expert and therefore cannot offer expert opinions beyond the limited scope of why he disqualified plaintiff, which involves the "review[] and use of NFPA 1582 when evaluating and examining fire recruits" as the interrogatory answer explains, but does not touch on whether the standards in NFPA 1582 are job related and consistent with business necessity. And even if Dr. Wright were allowed to go beyond the scope of his explanation of why he disqualified plaintiff and were qualified as an expert on the issue, it is clear from the evidence that he has never undertaken to verify the standard as job related and consistent with business necessity. As a result, there is an absence of proof supporting the affirmative defense. *See, Celotex Corp. v. Catrett,* 477 U.S. at 325, 106 S.Ct. 2548 (1986).

Second, the standard is not job related because it does not "fairly and accurately measures the individual's actual ability to perform the essential functions of the job," nor is there "a predictive or significant correlation between the qualification and performance of the job's essential functions."

*Bates v. United Parcel Serv., Inc.,* 511 F.3d 974, 996. On the contrary, according to plaintiff's expert, Dr. John Anderson[11], a requirement of 4 A1C tests within 12 months "has no connection to [plaintiff's] ability to perform his job." (Anderson Report at ¶16). Dr. Anderson explains that an A1C test "is not reflective of daily glucose fluctuations nor does it provide any insight into risk for hyper or hypoglycemia in a given individual. The AIC is merely an average of overall glucoses and patients with the same A1C measurement can have very different degrees of daily glucose variations." (Anderson Report at ¶18). Dr. Anderson goes on to state that an A1C test "cannot predict risk of hypo or hyperglycemia in an individual, and it therefore is not a predictor of whether or not a person poses a safety risk. In addition, it is not reflective of any individual's mental or physical capabilities." (Anderson Report at ¶19). Instead, the "A1C test is a clinical marker that helps guide therapy decisions and has never been intended as an assessment tool for qualifications for employment. Those types of assessments must be made independently for each given individual based upon his or her mental and physical capabilities. Moreover, the NFPA standard application of four A1C tests in a given year requires that an individual rigidly be seen exactly every 3 months in order to meet that qualification. The A[merican] D[iabetes]

---

[11]     Plaintiff has presented the Court with the Report of plaintiff's retained expert, Dr. John Anderson, on this issue. Dr. Anderson is a graduate of the Vanderbilt University School of Medicine and is board certified in Internal Medicine and has 30 years of clinical experience in practice, with a focus on diabetes. (Anderson Report at ¶2). He consults and teaches nationally and internationally, and is a longtime volunteer for the American Diabetes Association (ADA). (*Id.*). In 2013 he served as President of Medicine and Science for the ADA, the only primary care physician to have led the ADA in its history. (*Id.*).

A[ssociation] has long stated that individuals with diabetes under good control can have A1C tests performed much less frequently. This standard necessarily discriminates against people with type 1 diabetes such as Mr. Blankenship who are actually under good control." (Anderson Report at ¶20).

Similarly, the evidence is undisputed that the A1C tests standard is not consistent with business necessity under the *Bates* test because it does not in any way confirm or predict the "probability of occurrence" of the risk that defendant claims the standard addresses. *See, Bates v. United Parcel Serv., Inc.,* 511 F.3d at 996. "For a safety qualification to meet the business necessity defense, it must be based on current medical knowledge about the disability and on the **real risks** that the disability may present." *Verzeni v. Potter,* 109 F. App'x 485, 491 (3d Cir. 2004) (emphasis added). Again, the A1C tests cannot predict the risk of hypo or hyperglycemia in an individual, it is therefore is not a predictor of whether or not a person poses a safety risk, and there is absolutely no predictive or significant correlation between the A1C frequency of measurement and safe performance of the job.. (Anderson Report at ¶¶19-20). In other words, having 4 A1C tests in 21 months provides no information regarding the "probability of occurrence" of a safety-related accident or incident, which is the "risk" that the standard is supposed to address. And as a result, the standard is not based on the real risks that a person with Type 1 diabetes who has not had 4 A1C measurements in 12 months presents. *Id.*

Moreover, as Dr. Anderson points out, the standard at issue actually works to discriminate against the very persons who pose the least risk: persons, like plaintiff, who are so well-controlled that their Endocrinologist, like Dr. Fowler, in his or her professional clinical judgment, does not recommend testing 4 times a year. (Anderson Report at ¶¶17, 20; Fowler Decl. at ¶12; Fowler Decl. Exh. 3).

As a result, the A1C test standard is not "necessary" because it does not provide the information for which it is used, meaning the risk of hypoglycemic event, and it actually works to screen out persons who have a lower risk of hypoglycemic events due to their level of education and understanding of diabetes and diabetes self-management, and history of stability and control of their blood glucose levels.

### PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON DEFENDANT'S DIRECT THREAT AFFIRMATIVE DEFENSE

Defendant has asserted an affirmative defense that plaintiff posed a "direct threat." (Defendant's Answer [Doc. No. 9], at p. 5). "Direct threat" is defined by the EEOC Regulations as "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. §1630.2(r). When considering whether an employee is a direct threat, the key is "not ... whether a risk exists, but whether it is significant." *Bragdon v. Abbott*, 524 U.S. 624, 649, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). The assessment of risk "must be based on medical or other objective evidence" and the determination that a

significant risk exists must be objectively reasonable. *Id.* at 649–50, 118 S.Ct. 2196. The assessment of whether a person poses a direct threat must take into account several characteristics of the harm allegedly posed by the individual with a disability. *See, Sch. Bd. of Nassau County v. Arline,* 480 U.S. 273, 287–88, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987); *see also Bragdon,* 524 U.S. at 649, 118 S.Ct. 2196 (ADA's direct threat provision and regulations codify *Arline*). *Branham v. Snow*, 392 F.3d 896, 905–06 (7th Cir. 2004).

To determine whether plaintiff is a direct threat and therefore not qualified to perform the job of Fire Fighter, several factors must be considered. including: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that potential harm will occur; and (4) the imminence of potential harm. *Branham v. Snow*, 392 F.3d 896, 907 (7th Cir. 2004).

In Dr. Anderson's Report, he explains that he has knowledge of the applicable legal standards and provides his expert opinion that plaintiff did not pose a direct threat. (Anderson Report at ¶25). Defendant did not disclose an expert to rebut or call into question Dr. Anderson's opinion on the issue, and as a result, defendant has no evidence to support this issue, on which it carries the burden of proof as an affirmative defense. **As a result, because there is an absence of proof supporting the affirmative defense,**

plaintiff is entitled to summary judgment on the affirmative defense. *See,*
*Celotex Corp. v. Catrett,* 477 U.S. at 325, 106 S.Ct. 2548 (1986).

CONCLUSION

For these reasons, plaintiff asks the Court to enter summary
judgment in his favor on the issue of liability on his ADAAA claim, finding
that defendant violated the ADAAA by using a qualification standard that is
not job related and consistent with business necessity to disqualify him from
the position of Fire Fighter recruit because of his disability. Plaintiff also
asks the Court to enter summary judgment on defendant's direct threat
affirmative defense.

Respectfully submitted,

Wade B. Cowan (#9403)
85 White Bridge Road
Suite 300
Nashville, Tennessee 37205
(615) 256-8125
wcowan@dhhrplc.com
*Counsel for plaintiff*

## CERTIFICATE OF SERVICE

I certify that on January 17, 2020, a copy of this document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to:

J. Brooks Fox
Assistant Metropolitan Attorney
P.O. Box 196300
Nashville, TN 37219
*Counsel for Defendants*

Wade B. Cowan