IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

CORY BLANKENSHIP,     )
            )
  Plaintiff,      )
            )
v.           )  NO. 3:19-cv-00146
            )  JUDGE RICHARDSON
METROPOLITAN GOVERNMENT OF )
NASHVILLE AND DAVIDSON COUNTY, )
TENNESSEE,       )
            )
  Defendant.     )

## MEMORANDUM OPINION

Pending before the Court are cross-motions for summary judgment: Doc. No. 21 ("Defendant's Motion") and Doc. No. 24 ("Plaintiff's Motion").[1] The parties respectively have filed responses (Doc. Nos. 30 and 32) to the other party's motion, replies (Doc. Nos. 34 and 35) in support of the parties' own motion, and responses to the other party's Statement of Undisputed Facts (Doc. Nos. 31 and 33). In addition, Defendant filed a Sur-Reply with respect to Plaintiff's Motion (Doc. No. 38).

## BACKGROUND[2]

This action arises from Plaintiff's application to become a firefighter with Defendant Metropolitan Government of Nashville and Davidson County. Plaintiff applied for the position in

---

[1] Plaintiff moved for summary judgment only on the issue of liability and the affirmative defense of direct threat. (Doc. No. 24).

[2] Unless otherwise noted, these facts are taken from the parties' responses to Statements of Undisputed Facts (Doc. Nos. 31 and 33) and are undisputed for purposes of summary judgment. The Court notes that most of the relevant facts are undisputed. Where qualified herein, the Court views the asserted facts as one party's assertion of the facts only and does not make a judgment as to the truth thereof, according to the standards governing motions for summary judgment.

August 2017 and received a conditional offer of employment in October 2017, contingent on a medical examination. On December 15, 2017, Defendant withdrew its offer and advised Plaintiff that he had been medically disqualified for the position by Defendant's Civil Service Medical Examiner, Dr. Gill Wright.

Plaintiff is a person with Type 1 diabetes mellitus, a physical impairment that substantially limits the operation of his endocrine system as compared to the average person in the population without Type 1 diabetes. Defendant's denial of Plaintiff's application was based upon Plaintiff's disqualification under the National Fire Protection Association ("NFPA") Standards for Fire/EMT Trainees, adopted by Defendant in 1991. (Doc. No. 21-1 at 7). Under the NFPA standards, Type 1 diabetes is considered a "Category A" medical condition that "would preclude a person from performing as a member in a training or emergency operational environment by presenting a significant risk to the safety and health of the person or others, unless the candidate meets 12 specific criteria." (Doc. No. 21-2 at 16 and 23). Plaintiff's disqualification was based on a single one of those 12 criteria, that being the quarterly A1C test standard found at NFPA § 6.20.1(1)(g)(ii) ("the NFPA Standard"), which requires the candidate to present medical evidence that allows the fire department physician to determine whether the candidate "has had hemoglobin A1C measured at least four times a year (intervals of 2 to 3 months) over the last 12 months prior to evaluation if the diagnosis of diabetes has been present over one year." (Doc. No. 21-2 at 23).

After his employment offer was withdrawn, Plaintiff requested a medical waiver from Defendant's Civil Service Commission, based on his treating endocrinologist's assessment that quarterly A1C tests are unnecessary because of Plaintiff's demonstrated high level of education, motivation, control of his diabetes, and stability of A1C, and because "the lack of 4 A1C tests in the 12 months before his medical evaluation is not in any way evidence that he was at an increased

2

risk for hypoglycemia that would have created a risk to himself or others as a Fire Fighter." (Doc. No. 27-2 at 6). After a hearing,[3] the Civil Service Commission denied Plaintiff's medical waiver request.[4]

Plaintiff filed this action based upon the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 121101, *et seq.*, and asserts a claim specifically under 42 U.S.C. § 12112(b)(6) in particular. Plaintiff seeks damages and injunctive relief, including enjoining Defendant from enforcing the NFPA Standard relied upon in denying employment to Plaintiff. The parties have now filed the above-referenced cross-motions for summary judgment.

## SUMMARY JUDGMENT

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248.

---

[3] Dr. Wright testified at the hearing that if Plaintiff had had four hemoglobin A1C tests in the previous 12 months, there was no reason that Dr. Wright could not recommend a medical waiver. (Doc. No. 31 at ¶ 13). Dr. Wright confirmed this testimony in his deposition. (*Id.* at ¶ 14).

[4] Since the filing of these motions, Plaintiff provided additional, updated A1C readings and Dr. Wright informed the Fire Department that, with these additional readings, he would support a waiver recommendation to the Civil Service Commission. (Doc. No. 29-2 at ¶ 4). Plaintiff accepted the Fire Department's conditional offer of hire and began the hiring process for new trainees in the recruitment class of April 1, 2020. (*Id.* at ¶ 5). These post-motion developments do not moot Plaintiff's claims for monetary relief. Arguably, they do moot any request for injunctive relief, although that mootness issue is not before the Court at this time.

3

On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id*. at 628.

A party asserting that a fact cannot be or genuinely is disputed—i.e., a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the non-moving

4

party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *New Century Found. v. Robertson*, 400 F. Supp. 3d 684, 689 (M.D. Tenn. 2019) (citing *Ferro Corp. v. Cookson Group, PLC*, 585 F.3d 946, 949 (6th Cir. 2009). "[S]ummary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).

## EXPERT WITNESSES

There is an initial dispute in this case involving Defendant's expert witness, Dr. Wright. Plaintiff asserts that Defendant cannot rely on Dr. Wright's opinions to rebut Plaintiff's expert witnesses because Defendant did not properly disclose Dr. Wright as an expert witness. Plaintiff argues that Defendant did not provide an expert disclosure for Dr. Wright until January 23, 2020, almost two months after the deadline for expert disclosures and one month after the deadline for deposing experts.

Defendant, on the other hand, argues that Dr. Wright, who is Defendant's Civil Service Medical Examiner, was disclosed in this case several times and in several ways: (1) in Defendant's initial disclosures as someone with discoverable information about Defendant's defenses; (2) in Defendant's discovery responses, where Dr. Wright's potential testimony was also summarized; (3) as evidenced by the fact that Plaintiff's counsel took Dr. Wright's deposition and asked about

5

his medical opinions; (4) in Defendant's expert disclosure on January 23, 2020; (5) in the fact that, since before the lawsuit was filed, all parties had knowledge that Dr. Wright is the person who recommended a medical disqualification for Plaintiff; indeed, the Complaint itself refers to Dr. Wright as Defendant's medical director, and Plaintiff's allegations center on Dr. Wright's medical opinions; and (6) Plaintiff's experts, Dr. Anderson and Dr. Fowler, reviewed Dr. Wright's testimony and specifically responded to it (Doc. Nos. 27-1 and 27-2).

A party must disclose to the other parties the identity of any witness it may use at trial to present expert testimony. Fed. R. Civ. P. 26(a)(2). If a party fails to provide information as required by Fed. R. Civ. P. 26(a), the party is not allowed to use that information to supply evidence on a motion, at a hearing, or at trial "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). A party who does not comply with the discovery rules may avoid sanctions if "there is a reasonable explanation of why Rule 26 was not complied with or [if] the mistake was harmless." *Jaiyeola v. Toyota Motor N. Am., Inc.*, No. 19-1918, 2021 WL 518155, at *4 (6th Cir. Feb. 1, 2021) (citing *Howe v. City of Akron*, 801 F.3d 718, 747 (6th Cir. 2015)). The burden to show substantial justification or harmlessness is on the noncompliant party. *Starlink Logistics, Inc. v. ACC, LCC,* No. 1:18-cv-0029, 2020 WL 619848, at *3 (M.D. Tenn. Feb. 10, 2020). In assessing whether a party's untimely disclosure was justified or harmless, the court analyzes five factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence. *Id.; Jaiyeola,* 2021 WL 518155, at * 4 (citing *Howe,* 801 F.3d at 748).

Rule 37(c)(1) does not compel the district judge to exclude testimony in its entirety. *Howe,* 801 F.3d at 783–84. Thus, a district judge retains discretion to fashion an equitable remedy that is

6

"consonant with both the text and logic of Rule 37(c)(1)." *Id.* at 784, *cited in Adams v. Farbota*, 306 F.R.D. 563, 572 (M.D. Tenn. 2015).

The Court finds that there was no surprise to Plaintiff that Dr. Wright would be an expert witness in this case. Dr. Wright is the physician whose opinion formed the basis of the decision not to hire Plaintiff. In addition, Plaintiff has taken the deposition of Dr. Wright and had the opportunity to explore the reasons for his opinions. Allowing Dr. Wright's testimony will not disrupt the trial, given that the trial has not yet been rescheduled. The evidence presented by Dr. Wright is clearly important to this case, and the Court finds that the failure to provide timely disclosures concerning this expert is harmless under these circumstances. To the extent Plaintiff believes he needs additional discovery from Dr. Wright in order fully to prepare for trial, he may seek leave from the Magistrate Judge to re-depose Dr. Wright.

## AMERICANS WITH DISABILITIES ACT

The ADA prohibits discrimination against a qualified individual on the basis of disability with regard to the person's job application procedures or hiring (hereinafter, "disability-based discrimination"). 42 U.S.C. § 12112(a). In subsection (b) of Section 12112, disability-based discrimination is defined to include various employer actions and failures that are specified in the seven enumerated paragraphs of that subsection. *See* 42 U.S.C. § 12112(b). These paragraphs cover a number of things an employer might do (or fail to do) to block a person with a disability from advancing in the workplace, including "using qualification standards . . . that screen out or tend to screen out [such] an individual." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 78

7

(2002).[5] The issue presented in this case is whether Defendant, in relying upon the NFPA Standard to deny Plaintiff's application for employment, violated the ADA, specifically 42 U.S.C. § 12112(b)(6). Under that paragraph, disability-based discrimination includes the following:

> using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

42 U.S.C. § 12112(b)(6). The parties do not dispute that the NFPA Standard screens out individuals who have Type 1 diabetes if they do not satisfy the criteria for exception found at Section 6.20.1(1) of that standard.

To establish a *prima facie* violation of § 12112(b)(6), a plaintiff must show that (1) he meets the other (non-challenged) qualifications and (2) the challenged qualification screens out, or tends to screen out, an individual, or a class of individuals, with a disability. *McKereghan v. City of Spokane*, No. CV-06-0215-EFS, 2007 WL 3406990, at *4 (E.D. Wash. Nov. 13, 2007). Defendant agrees, for purposes of these Motions, that Plaintiff can establish this *prima facie* case. (Doc. No. 22 at 2).

The paragraph on which Plaintiff relies, 42 U.S.C. § 12112(b)(6), itself creates an affirmative defense[6] to claims based on that paragraph. That is, it provides that the use of

---

[5] "As the EEOC explained in its interpretive guidance, the purpose of this provision is to ensure that individuals with disabilities are not excluded from job opportunities unless they are actually unable to do the job. It is to ensure that there is a fit between job criteria and an applicant's (or employee's) actual ability to do the job. *E.E.O.C. v. Murray, Inc.,* 175 F. Supp. 2d 1053, 1063 (M.D. Tenn. 2001).

[6] The fact (if indeed it is a fact) that an examination is "job-related and consistent with business necessity" is an affirmative defense. *Small v. Memphis-Shelby Cty. Airport Auth.*, No. 2:13-cv-02437-JMP-dkv, 2015 WL 7776605, at *17 (W.D. Tenn. Dec. 2, 2015) (citing *Chevron*, 536 U.S.

8

qualification standards, employment tests, or other selection criteria[7] is not included within the definition of—*i.e.*, does not constitute—disability-related discrimination if the qualification standard "is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6). That defense ("the Business-Necessity Defense") is more specifically set forth in Section 12113(a), which adds an element to the defense (italicized below) that is not suggested in 42 U.S.C. § 12112(b)(6):

> It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, *and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter.*

42 U.S.C. § 12113(a) (emphasis added). In addition, 42 U.S.C. § 12113(b) states:

> (b) Qualification standards
>
> The term "qualification standards" may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace.

---

at 78)). That is to say, the Business-Necessity Defense set forth in the latter part of 42 U.S.C. §§ 12112(b)(6) and 12113(a) prescribes an affirmative defense. As an affirmative defense, the burden to establish it rests on the defendant. *See E.E.O.C. v. Murray, Inc.*, 175 F. Supp. 2d 1053, 1065 (M.D. Tenn. 2001) ("Although the defendant is permitted to engage in medical screening under the ADA, it has the burden of establishing that the screening is job-related and consistent with business necessity." (citing *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1184 (6th Cir. 1996))).

[7] Hereinafter, for ease of reference, the Court generally will use the term "qualification standard" to refer to anything that is properly considered either a qualification standard, an employment test, or a selection criterion, as there appears to be no meaningful distinction between those concepts for present purposes.

9

42 U.S.C. § 12113(b). The term "qualification standards" is otherwise not defined in the ADA. "Direct threat" is defined in the ADA as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3).

For purposes of both motions for summary judgment herein, the Court accepts the parties' agreement that Plaintiff has set forth a *prima facie* case of discrimination under 42 U.S.C. § 12112(b)(6) and that Defendant bears the burden of proving entitlement to any defenses. The question becomes what each side must do to prevail on its own motion for summary judgment, and/or defeat the other side's motion, considering that Plaintiff bears the ultimate (trial) burden of establishing his claim and that Defendant bears the ultimate (trial) burden of establishing its affirmative defenses.

Technically, on Plaintiff's motion, Plaintiff must initially show that there is no genuine issue of material fact as to either of what the parties call affirmative defenses[8] and that he is entitled to a ruling in his favor as to those defenses. If Plaintiff does so, then Defendant, to avoid summary judgment, must demonstrate a genuine issue of material fact as to at least one of its affirmative defenses. Similarly, on Defendant's motion, Defendant must make an initial showing that there is no genuine issue of material fact as to one (or both) of its affirmative defenses—in which case (if Plaintiff does not demonstrate a genuine issue of material fact), it is entitled to judgment as a matter of law. If Defendant makes such a showing, then to avoid summary judgment, Plaintiff must demonstrate a genuine issue of material fact as to whichever affirmative defense(s) Defendant initially has shown involve(s) no genuine issue of material fact.

---

[8] As explained below, there is a difference between a "direct threat" affirmative defense and a "direct threat" qualification standard.

10

## BUSINESS NECESSITY DEFENSE

If a medical examination screens out individuals with disabilities, the employer may establish an affirmative defense to an alleged violation of 42 U.S.C. § 12112(b)(6) if it shows that the screening criteria are job-related and consistent with business necessity. *Equal Emp. Opportunity Comm'n v. Murray, Inc.,* 175 F. Supp. 2d 1053, 1062 (M.D. Tenn. 2001). Considering how Rule 56 works, on its own motion for summary judgment the employer bears the burden of showing (removing any genuine dispute) that the qualification standard is job-related and consistent with business necessity.[9] *Id.* For purposes of a plaintiff's motion for summary judgment, the plaintiff has the initial burden to show (showing that it initially would appear) that the employer *cannot* establish this defense; if the plaintiff can satisfy that burden, then the defendant must respond by showing that (despite the plaintiff's initial showing) there actually is a genuine issue of material fact as to the defense.

In order to meet its burden to show job-relatedness and business necessity, an employer must demonstrate that its challenged qualification standard is both (i) based on actual ability rather than on general physical or mental impairment and (ii) necessary for the operation of its business. *Murray,* 175 F. Supp. 2d at 1063.[10]

---

[9] *Murray* involved a medical-screening requirement. If the medical screening revealed that a forklift operator had certain conditions, he or she was *per se* excluded from that position. *Murray*, 175 F. Supp. 2d at 1062. The court found this requirement to be the type of generally applicable qualification standard described in 42 U.S.C. § 12112(b)(6). *Id.* Therefore, it was the kind of standard that would constitute "disability-related discrimination," absent an affirmative defense thereto.

[10] Quoting from EEOC interpretive guidance, the court stated: "Selection criteria that exclude, or tend to exclude, an individual with a disability or a class of individuals with disabilities because of their disability but do not concern an essential function of the job would not be consistent with business necessity." *Murray,* 175 F. Supp. 2d at 1063 (quoting 29 C.F.R. § 1630, App. § 1630.10).

11

Defendant argues that the correct standard for evaluating whether the qualification standard at issue herein is job-related and consistent with business necessity is found in *Michael v. City of Troy Police Dep't*, 808 F. 3d 304 (6th Cir. 2015). As discussed more fully below, *Michael* did not involve a challenge to an employer's general qualification standard under 42 U.S.C. § 12112(b)(6), but rather the plaintiff's challenge to being placed on leave due to his allegedly no longer being a "qualified individual" under the ADA, 42 U.S.C. § 12111(8). *Id.* at 307. The court held that a disabled person is not "qualified" for an employment position if he or she poses a direct threat to the health or safety of others which cannot be eliminated by a reasonable accommodation.[11] *Id.* The court did not find that the plaintiff failed to meet an existing qualification standard, and indeed none was mentioned in the case; instead, the plaintiff was found to be unqualified, period, and not merely unable to meet a particular qualification standard. Thus, *Michael* involved an individual assessment of whether a particular person was "qualified" for the position,[12] not an assessment of whether a general, across-the-board standard as described in Section 12112(b)(6) is job-related and consistent with business necessity. Therefore, *Michael* does not control, and indeed is not persuasive, as to the business necessity defense in this case.

---

[11] The *Michael* court did hold that whether the employer properly determined that the plaintiff posed a direct threat, for purposes of determining whether he was "qualified," depended on the objective reasonableness of the employer's actions and held that the employer could rely upon a medical opinion that was itself objectively reasonable. *Michael*, 808 F.3d at 307. That analysis was in reference to a threat determination as to a particular employee, not a general, across-the-board qualification like the one challenged here.

[12] "The ADA mandates an individualized inquiry in determining whether an employee's disability or other condition disqualifies him from a particular position." *Gale v. Trinity Health Sys.*, No. 2:18-cv-92, 2019 WL 339927, at *10 (S.D. Ohio Jan. 28, 2019) (quoting *Holiday v. City of Chattanooga*, 206 F.3d 637, 645 (6th Cir. 2000)). So *Michael* certainly involved a very relevant issue under the ADA, just not the particular relevant issue implicated on the instant motions.

12

The Fifth Circuit, in a case cited previously by this Court, has held that "business necessity addresses whether the qualification standard can be justified as an across-the-board requirement." *E.E.O.C. v. Exxon Corp.,* 203 F.3d 871, 875 (5th Cir. 2000), *cited in Murray,* 175 F. Supp. 2d at 1065. The court in *Murray* found that the defendant there (as in *Exxon*) employed a general safety standard that, once challenged, was analyzed under the general defense of business necessity and job-relatedness. *Id.* at 1065, n.14.[13] In other words, the business necessity defense applies to across-the-board standards that are uniformly applied, as opposed to actions or decisions taken as to particular, individual employees.

**DIRECT THREAT DEFENSE**

As noted above, the term "qualification standards" under Section 12112(b)(6) "may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace."[14] 42 U.S.C. § 12113(b). The term "direct threat" means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation. 42 U.S.C. § 12111(3).

---

[13] In *Murray,* the court held that the direct threat "defense" did not apply because the determination that an individual poses a direct threat must be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job and no such individualized assessment had occurred; rather, the employer applied a general qualification standard that had to be analyzed under the general defense of job-related and business necessity. *Murray,* 175 F. Supp. 2d at 1065, n.14.

[14] Hereinafter, for the sake of convenience and brevity, the Court will refer to the requirement mentioned in this quote as a "no-threat requirement."

The parties and some courts[15] speak as if 42 U.S.C. § 12113(b) prescribes a "direct threat" affirmative defense. But courts[16] discuss the no-threat requirement mentioned in 42 U.S.C. § 12113(b) as a qualification standard. The confusion likely is caused by apparent imprecise drafting of 42 U.S.C. § 12113(b), as discussed below. To unravel the confusion, the Court will examine what proper role the no-threat requirement actually has in the analysis of an ADA claim. Ultimately, the Court concludes that neither of these views are correct, and that instead 42 U.S.C. § 12113(b) functions to remove any doubt that wherever the ADA refers to "qualification standards"—as it does in a few places—for some purpose, the statutory reference to "qualification standards" may be broad enough to include a no-threat requirement.[17]

---

[15] *E.g.*, *Bender v. Norfolk Southern Corp.,* 31 F. Supp. 3d 659, 669 (M.D. Pa. 2014) (defendant raised the "affirmative defense" of direct threat); *Echazabal v. Chevron USA, Inc.,* 336 F.3d 1023, 1027 (9th Cir. 2003) (because it is an "affirmative defense," the burden of establishing a direct threat lies with the employer); *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 170 (2d Cir. 2006) (the "poses a direct threat defense" requires an individualized assessment); *see also Kalskett v. Larson Mfg. Co. of Iowa,* 146 F. Supp. 2d 961, 982 (N.D. Iowa 2001) (characterizing direct threat to oneself as a matter of "qualification" and direct threat to others as a "defense").

[16] *Tolley v. Tenn. Valley Auth.. Bd. of Directors,* No. 3:08-cv-0075, 2009 WL 151569, at * 9 (M.D. Tenn. Jan. 21, 2009) (employee whose disability poses significant risk to health and safety of others is not "otherwise qualified"); *Mauro v. Borgess Med. Ctr.,* 137 F.3d 398, 402 (6th Cir. 1998) (disabled person not "qualified" for employment position if he poses direct threat to health and safety of others); *Schutts v. Bentley Nev. Corp.,* 966 F. Supp. 1549, 1556 (D. Nev. 1997) (individual not "qualified" if he poses significant risk to others' safety). The Court notes, consistent with its discussion herein, that it is problematic to speak as if Section 12113(b) means that a no-threat requirement *necessarily is* a qualification standard. Even if, contrary to the Court's determination below, one decides to ignore Section 12113(b)'s opening words "[t]he term," that would mean at most that a no-threat requirement "may be" a qualification standard; this suggests that it is *not necessarily* a qualification standard, and further suggests that it is not a qualification standard unless someone (the employer) makes it a qualification standard.

[17] As noted below, 42 U.S.C. § 12113(b)'s use of "may" seems odd. The word is indefinite because it could mean "lawfully is permitted to"—in which case it is implicit that it actually means something like "may, but does not have to." Alternatively, "may" could mean "may conceivably [or potentially] could" or "may, but does not necessarily," or "may, but in some circumstances

14

In so concluding, the Court starts with the statutory text, which provides that "the term 'qualification standards' may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b). Notably, the statute does not say that *qualification standards* may include a no-threat requirement; if it did, that seemingly would mean that an employer may include among its qualification standards a no-threat requirement, *i.e.*, it is at least generally lawful for an employer to impose a no-threat requirement. But what the statute actually says is that *the term "qualification standards"* may include a no-threat requirement. This could mean something very different. In particular, it could mean that wherever *the term "qualification standards"* appears in the ADA, the term "may"—whatever that means—be construed broadly enough to encompass a no-threat requirement.

In assessing the viability of this proposed construction of 42 U.S.C. § 12113(b) in light of its precise wording, it is important to note that the term "qualification standards" appears in three other places in the ADA. In one place, disability-based discrimination is defined to include "using qualification standards . . . that . . . tend to screen out . . . individuals with disabilities unless the standard is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6).[18] The proposed construction of 42 U.S.C. § 12113(b) would

---

does not,"—thus begging the question of when the term "qualification standards" actually does include a no-threat requirement. As indicated below, the Court rejects the first interpretation and adopts the alternative interpretation of "may" so as to give effect to the first two words of Section 12113(b). Under this construction, to say that "the term 'qualification standards' may include" a no-threat requirement means, in effect, that the term "may include a no-threat requirement but does not necessarily do so." And as further set forth below, the term "qualification standards" actually includes a no-threat requirement only in cases where the employer actually made a no-threat requirement a qualification standard.

[18] Here, and in Section 12113(c), the statute inexplicably switches mid-sentence from the plural, "standards," to the singular, "standard," but this unwarranted switch seems immaterial to the construction of the statute.

15

mean that a no-threat requirement "may" be the kind of thing [a qualification standard] that generally is (unlawfully) discriminatory if it tends to screen out individuals with disabilities; in other words, an employer's no-threat requirement is something that "may" be a "qualification standard" and thus subject the employer to potential liability under 42 U.S.C. § 12112(b)(6).

In the second place, an affirmative defense to a claim of disability discrimination may exist if "an application of qualification standards . . . that . . . tend to screen out . . . individuals with disabilities unless the standard is shown to be job-related for the position in question and is consistent with business necessity, and [job] performance cannot be accomplished by reasonable accommodation." 42 U.S.C. § 12113(a).[19] So the proposed construction of 42 U.S.C. § 12113(b) would mean that a no-threat requirement "may" be the kind of thing (a qualification standard) the application of which can afford an affirmative defense under certain circumstances. But that is not to say that a no-threat requirement *necessarily is* a qualification standard—and thus a basis for a defense under Section 12113(b) in a particular case. As explained above in a footnote, the Court believes that to say that a no-threat requirement "may" be a qualification standard is to say that it is a qualification standard under certain circumstances. It stands to reason that a no-threat requirement actually *is* a qualification standard in cases (but only in cases) where the employer actually made it such. The Court believes that any other construction is non-sensical, because it would mean that the employer can invoke an affirmative defense based on a qualification

---

[19] Notably, both 42 U.S.C. § 12112(b)(6) and 42 U.S.C. § 12113(a) suggest that a defendant can avoid liability for using a qualification standard, *if* it is job-related and consistent with business necessity, although only the latter statute expressly frames these as characteristics to be proven by the defendant as an *affirmative defense* (as opposed to perhaps characteristics to be *dis*proven by the plaintiff in its case in chief). But as indicated above in a footnote, whether considered under 42 U.S.C. § 12112(b)(6) or under 42 U.S.C. § 12113(a), these characteristics are treated as fodder for an affirmative defense, and not things to be disproven by the plaintiff.

16

standard—a no-threat requirement that in fact never was a qualification standard. And this Court declines to recognize the existence of a qualification standard where it never actually existed. *See United States v. Fitzgerald*, 906 F.3d 437, 447 (6th Cir. 2018) ("'absurd results are to be avoided,' and courts should not construe a statute to 'produce an absurd result that we are confident Congress did not intend,'" (quoting, inter alia, *United States v. Turkette*, 452 U.S. 576, 580 (1981) (citation omitted))).

And in the third place, use of qualification standards based on an individual's uncorrected vision is prohibited unless the standard "is shown to be job-related for the position in question and consistent with business necessity." 42 U.S.C. § 12113(c). So the proposed construction of 42 U.S.C. § 12113(b) would mean that a no-threat requirement "may" be the kind of thing (a qualification standard) that, if based on an individual's uncorrected vision, presumptively cannot be used. But presumably, a no-threat requirements would virtually never be based on an individual's uncorrected vision in any event, and under the proposed construction of 42 U.S.C. § 12113(b), 42 U.S.C. § 12113(b) would not implicate this third reference to "qualification standards."

The Court sees no reason why the proposed construction of 42 U.S.C. § 12113(b) does not make perfect sense given the ADA as a whole, the particular roles of "the term 'qualification standards'" within the ADA, and the manner in which 42 U.S.C. § 12113(b) would dovetail with those roles under the proposed construction. Thus, the Court adopts the proposed construction as the correct one. Consistent with that adoption, the Court declines to construe 42 U.S.C. § 12113(b) in a way that would entirely ignore the opening words of this subsection, *i.e.* "the term"—including by construing it to mean merely than an employer generally may lawfully include among its

17

qualification standards a no-threat requirement.[20]  The Court must provide a reasonable construction that gives effect to *all* words of a statute. *United States v. Collins*, 683 F.3d 697, 706 (6th Cir. 2012) ("'we must give effect to every word of a statute wherever possible'" (quoting *Leocal v. Ashcroft,* 543 U.S. 1, 12 (2004)). The Court's proposed construction does that. And the Court believes that if Congress means to say something as simple as "an employer's qualification standards lawfully may include a no-threat requirement unless otherwise prohibited by law," it knows how to do so and would do so. *Royal Truck & Trailer Sales & Serv., Inc. v. Kraft*, 974 F.3d 756, 760 (6th Cir. 2020) ("Congress surely knew how to say 'exceeds authorized use' . . . Yet it did not do so in the [Computer Fraud and Abuse Act]. Congress's silence on that score is controlling." (some internal quotation marks omitted)). And that is not what Congress said here.

The upshot is that the Court, in assessing Defendant's so-called "direct threat defense," will adopt the proposed construction of Section 12113(b). Under this construction, as suggested above, a no-threat requirement has a particular role in the analysis of an affirmative defense. And the role is this: *if* the employer *actually* did have a no-threat requirement, then it will be treated as a qualification standard, the application of which potentially could provide Defendant an affirmative defense under Section 12113(a).[21]

---

[20] Under the Court's adopted construction, Section 12113(b) does mean this, but it means more than this. For example, it means that even though an employer *generally* lawfully may impose a no-threat requirement, the employer still is potentially liable if the no-threat requirement (like any other qualification standard) runs afoul of the anti-discrimination provision of 42 U.S.C. § 12112(b)(6).

[21] As suggested above, the statute uses the term "may," which in this context is ambiguous because there is no indication anywhere of any criteria to determine when a no-threat requirement, which "may" be considered a "qualification standard" as that term is used in Section 12113, *should* be considered a qualification standard. Erring on the side of Defendant by ensuring that a no-threat requirement will be treated as a "qualification standard," and thus can support an affirmative defense under Section 12113(a), the Court herein construes the term "may" to mean "does."

18

Defendant posits a different interpretation, without citing any authority beyond 42 U.S.C. § 12113(b) itself, Defendant states that "[a]nother defense to a 'qualification standards' challenge under Section 12112(b)(6) is that the individual poses a 'direct threat' to the heath and safety of other individuals in the workplace." The Court must disagree, finding this interpretation flawed—albeit understandably flawed, given the confusion surrounding this general topic in the existing case law. As explained above, in the Court's view, this is simply not how the statute works at all; the role of 42 U.S.C. § 12113(b) is not to say that a plaintiff's challenge to the application of a qualifications standard is subject to the defense that the plaintiff poses such "direct threat." Instead, the role of Section 12113(b), with respect to defenses, is merely to clarify that a no-threat requirement, *if it exists*, may be treated as a "qualification standard" upon which a defense can be premised (on the theory that Plaintiff could not satisfy such qualification standard with or without a reasonable accommodation).

Defendant cites only a single case to support the notion that it can ground a defense to a challenge to the application of the NFPA Standard upon the (alleged) fact that Plaintiff posed a direct threat to himself and other firefighters. *See Michael v. City of Troy Police Dept.*, 808 F.3d 304 (6th Cir. 2015). But that case did not involve a challenge to the application of a qualification standard, and certainly no attempt by the defendant to raise a defense based on a no-threat requirement. Instead, the case involved a police officer's challenge to an *adverse employment action* (placement on unpaid leave). *Id.* at 305. The plaintiff claimed that he had been placed on leave illegally based on his disability. *Id.* at 306-07. The employer moved for summary judgment, which the district court granted on the grounds that as a matter of law the plaintiff was not qualified for his position as a patrol officer, as required by the second element of an ADA discrimination claim. *See id.* at 307. The Sixth Circuit affirmed, holding that as a matter of law, the plaintiff could

19

not show that he was qualified for the position, because the evidence showed that he posed a direct threat to others due to certain cognitive defects. *Id.* at 307-08. So although the case may teach much about how the plaintiff's posing a direct threat to other persons will prevent the plaintiff from establishing the second element of a disability discrimination claim based on an adverse employment decision, it does not say that the plaintiff's posing a direct threat to others is a defense to a claim based on the allegedly discriminatory application of qualification standards.

The closest Defendant could get to making hay with *Michael* would be to point to the following language.

> A disabled person is not qualified for an employment position, however, "if he or she poses a 'direct threat' to the health or safety of others which cannot be eliminated by a reasonable accommodation." *Mauro v. Borgess Med. Ctr.,* 137 F.3d 398, 402 (6th Cir. 1998); *see also Holiday v. City of Chattanooga,* 206 F.3d 637, 647 n. 4 (6th Cir. 2000) (same); 42 U.S.C. § 12113(b). A "direct threat" is "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." *Id.* § 12111(3).

*Michael*, 808 F.3d at 307. The citation to Section 12111(b), though superficially supportive of Defendant's position, ultimately proves to be meretricious. It was included after a "see also" signal that followed an original "see" signal, which casts doubt on just how relevant the Sixth Circuit was implying 42 U.S.C. § 12113(b) was in the context. More to the point, it seems clear that the Sixth Circuit meant that Section 12113(b) generally supports the notion that a plaintiff is not qualified for an employment position if he or she poses a "direct threat" to others that cannot be eliminated by a reasonable accommodation. And it does; Section 12113(b) supports the notion that Congress concluded that it may be reasonable for an employer to conclude that if someone would poses a direct threat to others while on the job, he or she is not qualified for the job. But the Sixth Circuit did not say in citing Section 12113(b) here that if someone poses a direct threat to other persons, the defendant has a defense under Section 12113(b) to a challenge to the application of a

20

qualification standard. Nor could the Sixth Circuit reasonably have meant such a thing, because *Michael* involved no such challenge and because on its face Section 12113(b) simply is not susceptible to such an interpretation.

By its very terms, Section 12113(b) is about allowing a defense under Section 12113(a) based on an *existing* no-threat requirement. The idea is that if a no-threat requirement existed, then (like any other qualification standard) its application to take action with respect to the plaintiff will justify that action if (as presumably would often be the case) the no-threat requirement can be shown to be job-related and consistent with job necessity. It is not about allowing a defense to the alleged unlawful application of a particular qualification standard (such as the NFPA Standard) on the grounds that the plaintiff was unqualified anyway because he posed a direct threat to others.

Defendant has not raised (and seemingly could not have raised) any defense related to "direct threat" other than one based on Section 12113(b). But a defense to a challenge to the application of a qualification standard based on Section 12113(b) must be grounded in *a no-threat requirement that actually exists as a qualification standard*; absent a no-threat requirement, Section 12113(b) does not apply and thus cannot support a defense under Section 12113(a). And even if Defendant did have a no-threat requirement (a matter to which the Court turns below), it would not support a defense under Section 12113(a) to Plaintiff's challenge to Defendant's application of *some other* qualification standard (the NFPA Standard) to deny Plaintiff employment; by its terms; Section 12113(a) could provide a defense based on the existence of a no-threat requirement only if a no-threat requirement was "alleged[ly] appli[ed]" to "deny a job" to Plaintiff. *See* 42 U.S.C. §12113(a).

21

The upshot of all of this is that unless the NFPA Standard, which was the qualification standard used to deny Plaintiff a job, is properly deemed a no-threat requirement, Defendant has no defense under Section 12113(a) as claimed.

## PLAINTIFF'S MOTION

<u>Business Necessity</u>

Plaintiff did not move separately for summary judgment as to the business necessity defense the way he did as to the "direct threat" defense. However, he did move for summary judgment as to liability, to which he is not entitled unless he has shown (among other things) that Defendant cannot make it to a jury on the issue of the business necessity defense. Accordingly, the Court addresses whether Plaintiff has made that showing.

Plaintiff contends that the sole reason he was denied employment by Defendant is because Defendant medically disqualified him under the NFPA Standard. Plaintiff also contends that the sole reason Defendant medically disqualified him based on the NFPA standard was that he did not meet the required criterion of obtaining four A1C tests over the last 12 months. As noted earlier, Dr. Wright testified that if Plaintiff had met the frequency of A1C tests criterion, there was no reason Dr. Wright could not recommend a medical waiver. Plaintiff's first argument is that Defendant cannot establish a defense to the qualification criterion under which Plaintiff was disqualified.

Plaintiff argues that the business necessity defense fails here because Defendant has never validated the NFPA Standard as a fair and accurate measure of an individual's actual ability to perform the essential functions of the job. In *Murray*, the court stated that an employer urging a business necessity defense must validate the test or exam in question for job-relatedness to the specific skills and physical requirements of the sought-after position. 175 F. Supp. 2d at 1063

22

(citing *Belk v. Southwestern Bell Tel. Co.,* 194 F.3d 946, 951 (8th Cir. 1999)); *see also Ryan v. City of Highland Heights,* No. 1:93CV2593, 1995 WL 584733, at *3 (N.D. Ohio July 19, 1995) ("If employers wish to terminate disabled individuals because they have failed required tests, the employers should be made to justify their tests according to the standards of § 12113(a)").[22]

Plaintiff has filed testimony from his expert witness, Dr. Anderson, that the NFPA Standard is not job-related or consistent with business necessity. Dr. Anderson opined that the requirement of quarterly A1C readings has no connection to Plaintiff's ability to perform his job. (Doc. No. 27-1 at 11; Anderson Report, ¶ 16). Anderson stated that the A1C measurement is not reflective of daily glucose fluctuations and does not provide any insight into risk for hyper or hypoglycemia in a given individual. (*Id.* at 12, Anderson Report, ¶ 18). Moreover, Anderson opined that the A1C test does not assess the overall status of an individual with type 1 diabetes, is not a predictor of whether or not a person poses a safety risk, and is not reflective of any individual's mental or physical capabilities. (*Id.* at 12-13, Anderson Report, ¶ 19). He stated that individuals with well-controlled diabetes can have A1C tests performed much less frequently than quarterly. (*Id.* at 13, Anderson Report, ¶ 20). These arguments by Plaintiff suffice to shift the burden to Defendant to raise a genuine issue of material fact as to whether this standard gives a fair and accurate measure of an individual's ability to perform the job.

---

[22] Defendant does not dispute that it has never undertaken to validate or verify the NFPA Standard as job-related or consistent with business necessity or that the NFPA Standard does not independently test, evaluate, or verify the accuracy of any information or the soundness of any judgments contained in the NFPA documents. (Doc. No. 31 at ¶¶ 39-40). Nonetheless, Defendant argues now (citing testimony from Dr. Wright) that there is in fact justification for the applicable criterion prescribed by the NFPA Standard.

On the other hand, Defendant argues,[23] based on Dr. Wright's testimony at the Civil Service Commission hearing, that the quarterly A1C readings[24] required by its standard are necessary because insulin-dependent diabetics potentially have frequent blood sugar level fluctuations, which can lead to confusion or loss of consciousness, potentially placing them and others at risk. (Doc. No. 21-4 at 4).[25] Defendant maintains that requiring new hires to have quarterly A1C readings is job-related and consistent with business necessity because it gives Defendant objective data regarding a trainee's average blood sugar levels for the one year immediately prior to hire. Defendant asserts that because the criteria requiring the quarterly A1C readings are tied to being able to carry out the essential functions of the firefighter position in a way that is safe not only for the firefighter but also for his team, the criteria are job-related and consistent with business necessity. (*Id.* at 5).

Dr. Wright testified that he had a thorough knowledge of the duties of a firefighter, "having seen what they do" and having been "in the uniform" himself. (Doc. No. 21-3 at 22-23 (Dep. at

---

[23] In attempting to establish its affirmative defense, Defendant, again citing *Michael*, contends that to show its selection criterion was job-related and consistent with business necessity, it may rely upon its medical examiner's opinion, so long as the medical examiner's opinion is objectively reasonable. As noted, however, *Michael* did not involve a general, across-the-board standard such as the one at issue here.

[24] Numerous courts have recognized that the A1C test is a primary test for determining diabetes management. *Barnett-Waggoner v, Soc. Sec. Admin.,* No. 3:19-cv-00366, 2019 WL 1749136, at *10, n.7 (M.D. Tenn. Apr. 1, 2019); *Hutchins v. Comm'r of Soc. Sec. Admin.,* No. 3:18-cv-00279, 2019 WL 4071720, at *1, n.3 (S.D. Ohio Aug. 29, 2019); *White v. Comm'r of Soc. Sec.,* No. 3:16CV1895, 2017 WL 11152160, at *14, n.7 (N.D. Ohio Oct. 2, 2017).

[25] Wright testified that, unlike jobs which are "very preset" (where an employee with diabetes is able to adjust his insulin and his sugars), in a firefighter situation, he "may not know, other than when the bell rings, that he's got to go, and that may – depending on when he's eaten last, when he's taken his insulin, that it may place him at risk." (Doc. No. 21-4 at 5).

82, 87-88)). He testified that the 13 functions listed in the NFPA list of essential job tasks for a firefighter "could be directly impacted by a medical condition such [as Defendant's] diabetes and its control or lack thereof." (*Id.* at 23 (Dep. at 87-88)). He testified that if Plaintiff had hemoglobin A1C tests on a quarterly basis, and they showed good control, then he would be as well controlled as he could be and would not be at increased risk; but Dr. Wright did not have that "objective evidence." (Doc. No. 21-3 at 19, 22 (Dep. at 73, 82)).[26]

The Court finds that although Plaintiff has carried his initial burden on the issue of whether the business necessity defense applies—by pointing to evidence initially indicating that Defendant may not be able to raise a genuine dispute as to the validity of the defense—Defendant in response has raised a genuine issue of fact (through the testimony of Dr. Wright and the cases that have found that that the A1C test is a primary test for determining diabetes management) on this material issue. That is, Defendant has shown that despite Plaintiff's initial showing, there is sufficient evidence for a jury to determine that the NFPA Standard was job-related and consistent with business necessity, precluding summary judgment for Plaintiff as to liability.

Direct Threat

The question remains, however, whether Plaintiff is entitled to summary judgment as to (or, more likely from a procedural standpoint, an order under Rule 56 precluding) Defendant's defense based on the notion of "direct threat."

---

[26] "And being concerned that I don't have objective evidence and that he wasn't even followed for a period of time, I wanted reassurance that he is – because I don't want – at that point, without that information, I felt that he was at an increased risk and, you know, for himself or others." (Doc. No. 21-3 at 15 (Dep. at 82)).

Plaintiff argues that Defendant did not disqualify him because he was a direct threat; rather, the sole reason for denial of his requested medical waiver was the lack of quarterly A1C tests. Plaintiff seeks summary judgment as to the direct threat defense on this basis.[27]

As the Court noted above, the statute (42 U.S.C. § 12113(b)) provides that an employer may have a qualification standard that requires an employee not to pose a direct threat to the health or safety of other individuals in the workplace. As further indicated above, *if* such a no-threat requirement was applied to deny the plaintiff a job, the employer can raise the defense that the no-threat requirement was justified, *i.e.*, including that it was job-related and consistent with business necessity. *See* 42 U.S.C. § 12113(a). So the whole "direct threat" notion offers Defendant no defense unless it had a no-threat requirement that was applied by Defendant to deny Plaintiff a job. Plaintiff apparently agrees with this. As noted above, in this case, based on facts not in dispute, this means that Defendant has no "direct threat defense" unless the NFPA Standard[28] invoked to

---

[27] Dr. Wright testified that if Plaintiff met the A1C test requirement, there was no reason Dr. Wright could not recommend that Plaintiff receive the waiver. But Dr. Wright also testified that, without the quarterly A1C tests, he believed that Plaintiff would basically pose a direct threat to himself and potentially to others, including other firefighters. (Doc. No. 21-3 at 15 (Dep. at 52-53)); *see also id.* at 22 (Dep. at 82-83) ("And all of those risk factors, like I say, at the end of the day, those place him and others at risk").

Dr. Anderson, on the other hand, opined that Plaintiff did not pose a direct threat as defined in the ADA. (Doc. No. 27-1 at 15, Anderson Report at ¶ 25). And Plaintiff argues that the factors relied upon by Dr. Wright would potentially be present for *any* firefighter with Type 1 diabetes, so they are not related to an individualized assessment of Plaintiff or whether Plaintiff posed a direct threat to himself or others.

[28] Defendant's "direct threat" defense under Section 12113(a) has to be based on the NFPA Standard both because (i) Defendant has offered no evidence of anything else that could constitute a no-threat requirement, and because (ii) a defense under Section 12113(a) is by definition one based on the justifiability of the particular qualification standard *invoked to deny the plaintiff a job*-meaning, here, the NFPA Standard.

26

deny Plaintiff the job is properly deemed to require an employee not to pose a direct threat to the health or safety of other individuals in the workplace.

In the portion of its response to Plaintiff's motion for summary judgment dealing with "direct threat," Defendant discusses the purported virtues of the NFPA Standard. Additionally Defendant also argues that, absent regular A1C readings from Plaintiff in accordance with the NFPA Standard, Plaintiff would have posed a direct threat to others; according to Defendant, failure to comply with the standard would create a risk of Plaintiff's diabetes going unmanaged, potentially resulting in a hypoglycemic episode in which he might lose consciousness or become confused. The Court grants that a hypoglycemic episode for a firefighter could, depending on what the firefighter was actually doing at the time, pose a "threat" to others in at least a general sense, by for example rendering him unfit to provide emergency assistance to individuals in fire-related or other peril.

But that it not to say that any such threat qualifies as a "direct" threat, and Defendant has not explained why it does (beyond conclusorily asserting that it does). And even if noncompliance with the NFPA Standard could be said to result in a direct threat to others, that does not mean that the NFPA Standard is properly deemed a requirement not to be a direct threat to the health and safety of others; Defendant has done nothing to explain why it should be so deemed, and the Court greatly doubts that it should, since the NFPA Standard appears primarily to be about ensuring the applicant's fitness for duty, and only secondarily about directly protecting others from any threat posed by any lack of such fitness (including any risk of a hypoglycemic incident) that would be revealed by compliance. If Defendant wished to rely on the assertion that the NFPA Standard is a no-threat requirement, it should have said so and then supported the assertion. It did not, and such

27

efforts would have been a longshot anyway, and so the Court finds that the NFPA Standard is not a no-threat requirement and thus offers Defendant no defense under 42 U.S.C. § 12113(a).

Accordingly, the Court finds that reliance on the direct threat "defense" in this case is misplaced, as no one has shown that the statute even applies. Accordingly, pursuant to Fed. R. Civ. P. 56(g), the Court finds that there is no genuine issue of material fact herein as to the direct threat "defense" and Defendant may not rely thereon at trial. The Court will issue an order to this effect under Fed. R. Civ. P. 56(g).

**DEFENDANT'S MOTION**

Defendant first seeks summary judgment on its business necessity defense. The Court finds that Defendant has carried its burden initially to show the absence of a genuine dispute as to the (alleged) material facts that the NFPA Standard is job-related and consistent with business necessity, based on the testimony of Dr. Wright. But the Court also finds that Plaintiff has shown that despite Defendant's initial showing, a genuine dispute does remain on these material facts; he has done so by pointing to pertinent testimony of his expert, Dr. Anderson. A jury will have to determine at trial whether the NFPA Standard at issue is job-related and consistent with business necessity and thus provides Defendant with a defense under 42 U.S.C. § 12112(b)(6).[29]

Defendant next argues that it is entitled to the "direct threat defense," based upon the testimony of Dr. Wright, which Defendant argues is sufficient because it is "objectively reasonable." For the reasons stated above in connection with Plaintiff's Motion, Defendant may not rely herein on the "defense" of direct threat.

---

[29] Because there are genuine issues of material fact as to job-relatedness and consistency with business necessity, the Court need not reach Defendant's arguments about reasonable accommodation at this time.

**CONCLUSION**

For the reasons set forth above, (a) Defendant's Motion will be denied, and (b) Plaintiff's Motion will be denied as to liability and granted insofar as the Court will issue an order pursuant to Fed. R. Civ. P. 56(g) finding that the direct threat "defense"—that is, Defendant's purported defense supposedly existing pursuant to 42 U.S.C. § 12113(b)—is inapplicable in this case.

An appropriate Order will be entered.

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE