1   UNITED STATES DISTRICT COURT
    MIDDLE DISTRICT OF TENNESSEE
2   NASHVILLE DIVISION

3

    CORY BLANKENSHIP              )
4                                 )
    vs                           )        Case No. 3:19-cv-00146
5                                 )
    METROPOLITAN GOVERNMENT OF    )
6   NASHVILLE AND DAVIDSON        )
    COUNTY, TENNESSEE             )
7

8   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

9

                    BEFORE THE HONORABLE
10
          ELI J. RICHARDSON, U.S. DISTRICT COURT
11
            EXCERPT TRANSCRIPT OF PROCEEDINGS
12
             (Testimony of Dr. Gill Wright)
13
                     May 10, 2022
14
                      Volume 1
15

16  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

17

18

19

20

21

22

23  Patricia A. Jennings, RMR, CRR
    Official Court Reporter
24  719 Church Street, Suite 2300
    Nashville, TN 37203
25  patty_jennings@tnmd.uscourts.gov

```
 1   APPEARANCES:

 2   For the Plaintiff:        John W. Griffin, Jr.
                               Marek, Griffin & Knaupp
 3                             203 N. Liberty St.
                               Victoria, TX  77901
 4
                               Wade B. Cowan
 5                             Davies, Humphreys, Horton &
                               Reese, PLC
 6                             P.O. Box 50617
                               Nashville, TN  37205-0617
 7
     For the Defendant:        J. Brooks Fox
 8                             Metropolitan Legal Department
                               P.O. Box 196300
 9                             Nashville, TN  37219-6300

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           I N D E X

2
                            PLAINTIFF'S PROOF
3
   DR. GILL WRIGHT
4       Direct Examination by Mr. Griffin..............        4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              The above-styled cause came to be heard on

 2    May 10, 2022, at 8:30 a.m., before the Honorable Eli J.

 3    Richardson, District Judge.  The following is an excerpt of

 4    the proceedings that were had, to-wit:

 5

 6              MR. GRIFFIN:  Your Honor, at this time we would

 7    call Gill Wright to the stand.

 8              THE COURT:  All right, you may come forward.

 9              COURTROOM DEPUTY:  Please raise your right hand.

10                        DR. GILL WRIGHT,

11    called as a witness, having been duly sworn, was examined and

12    testified as follows:

13              THE WITNESS:  I do.

14              COURTROOM DEPUTY:  Thank you.  Please be seated.

15              MR. GRIFFIN:  May I proceed, Your Honor?

16              THE COURT:  You may.

17                        DIRECT EXAMINATION

18    BY MR. GRIFFIN:

19    Q.   Good afternoon.  Would you please state your full name?

20    A.   My full name is Gill C. Wright III.

21    Q.   Can I call you Dr. Wright?

22    A.   You may.

23    Q.   Good.  My name is John Griffin.  And as far as I know,

24    we have not had the pleasure of meeting until today; is that

25    right?
```

1  A.    That's correct.

2  Q.    But you had, as I understand it, testified under oath at

3  least twice with respect to Cory Blankenship, once at a

4  deposition and then once at a civil service hearing?

5  A.    Sure.

6  Q.    Okay.

7  A.    I don't consider the civil service's under oath

8  testimony, but I understand.

9  Q.    No problem.  In either case, you certainly were

10 endeavoring to tell the truth then at both occasions?

11 A.    Absolutely.

12 Q.    Perfect.  And what is your age, sir?

13 A.    My age?

14 Q.    Yes, sir.

15 A.    I am 62.

16 Q.    All right.  And tell us a little bit about your

17 education and your higher education.

18 A.    Okay.  I am a physician by training.  I started at

19 college in 1981 and then went to University of Nebraska, got

20 my undergraduate, went on to the University of Nebraska

21 Medical Center.  I received my MD there.  Graduated, did my

22 first year of residency training in family medicine at

23 Cheyenne, Wyoming.  Finished my last two years at the

24 University of Kansas, in Kansas City.  That was because my

25 wife got a chance to move and take a good job in Kansas City.

1    So I was lucky enough to be able to move.

2         So I practiced for about eight years in a town of

3    1700, had responsibility for about 1500 family members in the

4    community, did a little bit of everything, including

5    C-sections and such.

6    Q.   When is your degree, sir?

7    A.   What?

8    Q.   What year is your medical degree?

9    A.   1987.

10   Q.   All right.

11   A.   I believe I said that.

12   Q.   Great.  And let me ask you this:  Were you the medical

13   director for an insurance company, Mutual of Omaha, managing

14   health care systems for a bit?

15   A.   I was.

16   Q.   And what years were those, sir?

17   A.   That would have been -- I've got to think.  That's a

18   long time ago.  I did about -- I think it started in 1997 and

19   was roughly two years there.

20   Q.   All right.  And Mutual of Omaha Midwest was an HMO

21   organization?

22   A.   It was an HMO organization.

23   Q.   All right.  Were you doing administrative work at that

24   position?

25   A.   I was during that time.

1  Q.    And then you went to Cigna from 1999 to 2002?

2  A.    That is correct.

3  Q.    That, again, is another insurance company?

4  A.    It is.

5  Q.    And, again, that work was administrative?

6  A.    That was at that time, yes.

7  Q.    And I assume that in connection with those kinds of

8  jobs, you dealt a lot with workers' comp, insurance issues

9  and things like that?

10 A.    No, didn't really deal with worker's comp.  I was

11 responsible for the overall health care in Kansas City, about

12 80,000 individuals.  And with Cigna, we had responsibility

13 for three states:  Kansas, Missouri and Oklahoma.

14 Q.    All right.  And then you went to Concentra Metro IOD

15 Clinic?

16 A.    You skipped in there -- 2002 to 2012, I worked for

17 Shawnee Mission Medical Center doing occupational medicine.

18 Q.    Okay.  And this is a good time to ask you this question:

19 What is occupational medicine?

20 A.    Occupational medicine is -- some people would call it

21 work comp.  There are two main components.  Main components

22 are work injury, so seeing those individuals that have gotten

23 injured on the job and taking care of that side of things.

24 The other side is preemployment and routine physicals to look

25 for underlying medical conditions which may have an effect on

1    an individual's ability to do a job.  We would -- in that
2    category would be something like fit-for-duty exams also.
3    Those exams would be the employer has a concern that their
4    employee is -- got bad arthritis and is no longer able to
5    type or do something like that, and they may ask what other
6    things can they do or what can they do as alternatives.
7    Q.    Sure.  Now share with the jury, what is a clinician?
8    A.    Clinician, most people would think of that as somebody
9    that is in a clinic seeing patients.  Administrative would be
10   more paperwork.
11   Q.    What do clinicians do?
12   A.    Take care of patients.
13   Q.    And do clinicians have different specialties?
14   A.    They do.
15   Q.    Tell the jury if you don't mind what is your current
16   job?
17   A.    My current job?
18   Q.    Yes, sir.
19   A.    I am actually currently the Director of Health for
20   Metro-Davidson.
21   Q.    And when you made the decision in this case to
22   disqualify Cory Blankenship, what was your job title?
23   A.    I was a civil service medical examiner at that time.
24   Q.    I couldn't hear you.
25   A.    I was civil service medical examiner.

1  Q.    Medical examiner.  Okay, great.  And let me ask you

2  this:  Were you in the courtroom when Chief Swann described

3  the application process?

4  A.    Yes, I was.

5  Q.    And are you familiar with that is the process, that

6  someone has to go through an application process before

7  they're being offered a job?

8  A.    I am aware of that.

9  Q.    Okay.  And as I understand it -- well, let me just ask

10  you this in terms of clinicians.  When is the last time that

11  you were the physician in charge of continuous treatment for

12  a patient with diabetes?

13  A.    Well, from a clinical standpoint, I took care of a lot

14  of diabetics in conjunction with work injuries or other

15  things.  To be completely in charge of them would have been

16  when I was in practice.  So 1997, when I was completely, you

17  know, in charge of a diabetic.

18  Q.    And let me just ask you this:  Do you recall being asked

19  that precise question at your deposition, when is the last

20  time you were the physician in charge of continuous treatment

21  for a patient with diabetes?

22  A.    I wasn't asked that exact question, I don't believe.

23  Q.    Okay.

24          MR. GRIFFIN:  Your Honor, what is the best way of

25  allowing the witness to examine the deposition transcript?

 1          THE COURT:  Well --

 2          MR. GRIFFIN:  I can put it on the screen, but I

 3   also have one for him, if Your Honor prefers that.

 4          THE COURT:  Well, stand by one second.  This is

 5   the kind of question -- I know the choices, and with our

 6   brand new courtroom, I'm going to ask a question of my very

 7   able colleague here.  Stand by.

 8          (Confers with staff.)

 9          THE COURT:  There's so many new gadgets here, not

10   to say toys.  The question is how to use them most

11   effectively.  All right, there is a way to do this without

12   paper, but if you want to hand -- you have a paper copy to

13   show him?

14          MR. GRIFFIN:  I can.  I've got an extra one here

15   if it's handy; otherwise, I can put it up on the screen and

16   ask him.

17          THE COURT:  Well, here's the thing -- and there's

18   a way -- there are a lot of toggles and so forth to have it

19   shown just to the witness, which is probably appropriate to

20   not have, you know, the jurors to have it on their screen,

21   but if no one objects, we can just put it up and the jurors

22   can look at it also.

23          Any objection to that?

24          MR. FOX:  No objection.

25          THE COURT:  Okay.  Let's just do it that way.  You

1  can put it up on the screen then.  I think in general terms,
2  if someone gets -- you know, if someone was to object to that
3  approach, the thing to do is just to show it to the witness,
4  but if it's no problem to anyone, we'll just put it up on the
5  screen.  That's fine.
6                    MR. GRIFFIN:  No problem.
7                    THE COURT:  Thank you.
8  BY MR. GRIFFIN:
9  Q.   For now, though, Dr. Wright, you deny today being asked
10 this question:  When is the last time you were the physician
11 in charge of continuous treatment for a patient with
12 diabetes?
13 A.   I don't remember that question being asked in that
14 manner.
15 Q.   Let me just show you --
16 A.   Yeah.
17 Q.   -- what appears on page 22, line 9, when the exact
18 question is asked:  When is the last time you were the
19 physician in charge of continuous treatment for a patient
20 with diabetes?
21                    Does that refresh your memory on whether or not
22 that question was asked?
23 A.   That question was asked.
24 Q.   And do you affirm that you're not sure?
25 A.   Well, it depends on how you interpret that.

1  Q.    But I'm just trying for the jury to understand.  The
2  answer you gave under oath then was "I'm not sure"?
3  A.    "I'm not sure" would be correct.
4  Q.    Okay.  All right, fair enough.  And let me just --
5  A.    But I did have further -- further qualification at that
6  point.
7  Q.    No, I'm not arguing with you.  I'm just trying to make
8  sure the jury understands that you don't remember the last
9  time you had continuous responsibility of caring for a person
10 with diabetes?
11 A.    Where I was the primary provider of that.
12 Q.    Or providing continuous treatment?
13 A.    I think there's a difference there.
14 Q.    But that's the question you said you didn't know; right?
15 A.    I think I -- I went on and said I didn't know I had -- I
16 went on and answered that further.
17 Q.    Right, by saying at some point you were involved in
18 wound care for people with diabetes; right?
19 A.    I would be involved in wound care and other things, yes.
20 Q.    All right.  And let me ask you this:  Is it true, sir,
21 that you have no idea when is the last time you received any
22 continuous medical education in the area of diabetes?  Is
23 that true, sir?
24 A.    At that point in time, it probably was.  I since have
25 done that and actually re-certed in my boards, which required

1  intense knowledge of diabetes.

2  Q.   So since you gave sworn testimony in this case, you have

3  gone back and gotten more education?

4  A.   Yes.

5  Q.   If I'm hearing you right?

6  A.   I get ongoing continuous medical education, yes.

7  Q.   Right, but what I'm trying to establish for the ladies

8  and gentlemen of the jury, at the time your deposition was

9  taken, well after you had disqualified Mr. Blankenship, when

10 you were presented with the question of when is the last time

11 you got any education on diabetes, you said, quote, I have no

12 idea?

13 A.   I didn't because I didn't have in front of me any

14 records at the time.

15 Q.   Right.  And in looking at the defendant's exhibits,

16 there's still no records of any continuous medical education

17 for you either, is there?

18 A.   I don't know.  I provided it to -- I don't know where --

19 I don't know why that would be.

20 Q.   No problem.  But in fairness, you don't keep a record

21 yourself of your continuous medical education, do you?

22 A.   No, I don't need to.  The academy keeps it for me.

23 Q.   Well, where would the jury find any record of any of

24 this?

25 A.   It would all be in my academy records.

1  Q.    If you don't, it's okay, but do you have any explanation
2  for why none of those records are in the defense exhibits in
3  this case?
4  A.    I have no . . .
5  Q.    Let me ask you this:  You, Dr. Wright, had nothing to do
6  with the decision Metro made to conditionally offer him the
7  job?
8  A.    That's correct.
9  Q.    Okay.  And, likewise, you heard Chief Swann testify that
10 he had no role in disqualifying or revoking the offer.
11 Remember that?
12 A.    I do remember him saying that.
13 Q.    But you did have a role, did you not, in the decision
14 Metro made to revoke the offer that it had extended to him?
15 A.    I'm going to have to ask a better -- I don't understand
16 what you're asking.
17 Q.    And I thank you for letting me know you're not
18 understanding it because our goal is to communicate.
19          You did have a role in Metro's decision to revoke
20 its job offer to him?
21 A.    I don't believe I had a role.  I had a role in
22 presenting the information that I had to the Civil Service
23 Commission.
24 Q.    Right, but you have never walked away from the
25 responsibility as the person who made the decision to

1  disqualify him; right?  You have never run away from that?

2  A.   Yes, I disqualified him, or actually, if you look at it,

3  I temporarily disqualified him because I didn't have enough

4  information to make a decision.

5  Q.   Right, but that disqualification was what caused the

6  offer to be revoked; correct?

7  A.   I guess that's how the system -- how Metro's system

8  would work.

9  Q.   Right.  And just to complete the circle, Chief Swann was

10 shown Plaintiff's Exhibit 6, which you probably saw when it

11 was up, the letter congratulating Cory for the offer of the

12 firefighter position; right?

13          THE COURT:  For the record, what are you showing

14 up there?

15          MR. GRIFFIN:  Exhibit 6.  Plaintiff's Exhibit 6,

16 Your Honor.

17          THE COURT:  6?  All right.  So Exhibit 6.  Okay.

18 Yeah, I think you -- I think that is what you said the first

19 time.  Exhibit 6, okay.

20          MR. GRIFFIN:  No problem.

21 BY MR. GRIFFIN:

22 Q.   And you saw that when Chief Swann testified?

23 A.   I did see that when he testified.

24 Q.   Right.  And just to complete the circle, Metro, once it

25 offers a position to one of its candidates, it requires those

1  people that have been extended the offer to sign it and send

2  it back; correct?

3  A.   I don't -- I don't work in HR.  I don't know that

4  process.  I'm sorry.

5  Q.   So in all of your years with Metro, you did not -- you

6  were not aware that Metro, after extending an offer, requires

7  a person like Cory to sign it and send it back?

8  A.   No, that wouldn't be within what I . . .

9  Q.   Fair enough.  Fair enough.

10           As I understand it, and tell me if we have this

11  right, you did not consult with anyone at NFPA before you

12  disqualified Cory?

13  A.   No.

14  Q.   Okay.  You did not seek or acquire legal counsel before

15  you disqualified him; right?

16  A.   No.  I don't know why --

17  Q.   You didn't have to get approval from anybody at Metro to

18  disqualify him, did you?

19  A.   I did not have to get any to provide a medical opinion,

20  no.

21  Q.   Now, did you consult or confer with anybody before you

22  made that decision?

23  A.   We always -- I always discuss cases.  In this case, this

24  individual, Cory, was seen I believe by one of our nurse

25  practitioners.  We would have had a discussion at that time

1  we're seeing, you know . . .
2  Q.   Is that documented anywhere, sir?
3  A.   I believe it is in the record.  It would have been
4  signed by the nurse practitioner.
5  Q.   Where can the jury see any record of any deliberation
6  you had with any nurse practitioner?
7  A.   It's always our policy.
8  Q.   No, no, where can the jury see this document in the
9  exhibits that the defendant has offered up for this jury to
10  review?
11  A.   I don't know.  I don't -- I don't believe it's in there.
12  Q.   Okay.
13  A.   That wouldn't be our normal practice.
14  Q.   It would or would not be to make sure that was
15  documented?
16  A.   It would not necessarily be documented.  The discussion
17  would have taken place.
18  Q.   So then maybe just going off recollection now, just
19  mental recollection of what happened orally years ago?  Is
20  that what you're going off of?
21  A.   I, again, don't understand what you're asking.  I
22  understand what you're asking, but at the same time I
23  don't -- I don't -- I want to make sure I'm understanding
24  where you're asking -- what you asked about.
25  Q.   Well, first I asked you the question of whether you

spoke with anyone else before you made the decision.  At your
deposition you said no, and then today you said you may have
talked to some nurse practitioners.  And then I asked where
that was documented, and you said maybe it is.

I'm just trying to get the practice.  If there
were oral conversations about this man's future and whether
you were going to disqualify him, should they have been
documented somewhere for people to look at?

A.    Sir, I believe that at the time the nurse practitioner
saw him, she would have talked with me about what was missing
from the file.  I'm the one that made the ultimate decision
because I didn't have, as the records -- or as the form
shows, I did sign it saying it was temporary while we got
additional information.

Q.    Dr. Wright, do you remember what my last question was?
If you don't, it's okay.  I don't mind running it by you
again.  Do you have a recollection of the question I just
asked you?

A.    You asked about if I had documented.

Q.    No, I asked if there were conversations between you and
the nurse practitioner about this man's future and whether he
would be disqualified, should they be documented somewhere or
not?

A.    They wouldn't -- no, not necessarily.

Q.    Okay.

1  A.   We would have looked at -- I would have looked at the

2  paperwork, the information and made a decision.

3  Q.   So back to my original -- what we talked about, you may

4  be going off memory as to what happened here, as opposed to

5  having a document that actually describes what you and the

6  nurse practitioner talked about with respect to the pending

7  disqualification of Cory Blankenship; is that right?

8  A.   It's our typical process for the nurses -- nurse

9  practitioners to discuss cases with me when they don't have

10  information that they need to meet criteria.  So I would have

11  expected that they talked with me.

12  Q.   I understand that you're making a statement that you

13  have an expectation that you would have spoken to the nurse

14  practitioner, but we agree there's no record of that --

15  A.   There is no record.

16  Q.   And we're not going to hear from the nurse practitioner

17  in this case, are we?

18  A.   No.  She's left Metro.

19  Q.   Okay.  All right.  And so is it true, sir, that up until

20  this trial that you had never met Cory Blankenship himself?

21  A.   No, sir.

22  Q.   When you made the decision, you didn't know him?

23  A.   No, sir.

24  Q.   Except through the medical --

25            THE COURT:  Well, let me do this.  I want to be

1   clear here.  I think the question was:  Is it true that up

2   until this trial that you had never met Cory Blankenship?

3   Your answer was no, making it sound like maybe you were

4   saying that was not true, but I bet maybe what you meant was

5   you had not met him until this trial; is that right?

6                    THE WITNESS:  I had not met him until Civil

7   Service Commission January of 2018.  I met him there.

8   BY MR. GRIFFIN:

9   Q.   And I appreciate the Court's interceding to get that.

10                   At the time you made the decision to disqualify

11  him, you had never met this gentleman; right?

12  A.   At the time I made that decision to temporarily

13  disqualify him, no, I had not.

14  Q.   When I'm using the word "disqualify," we're referring to

15  the exhibit that we saw this morning where you disqualified

16  him for lack of information?

17  A.   I believe if you looked at that, it was marked that it

18  was temporary, a temporary disqualification.  And I do that

19  when I don't have enough information to be able to make a

20  decision.

21  Q.   Well, whether we call it temporary or long-term, it was

22  two years long, right, before he could get on as a

23  firefighter, right, after your disqualification?  It cost him

24  two years, did it not?

25  A.   Since the information wasn't provided, yes.

1  Q.    And we're going to talk a lot about the A1C information

2  here in a moment, but I wanted to also make sure that when

3  you made your disqualification decision, you made no attempt

4  to communicate in any manner with Dr. Fowler, the specialist

5  endocrinologist who Cory was seeing for his diabetes; is that

6  right, sir?

7  A.    We had actually recommended -- or requested all medical

8  records on Mr. Blankenship.

9  Q.    Let me just ask you again.  Is it true, sir -- have you

10 ever spoken to his physician, Dr. Fowler?

11 A.    No, I did not.

12 Q.    All right.  And Dr. Fowler complied with Nashville

13 Metro's request that he provide records; correct?

14 A.    He provided a letter and a form from 1582.

15 Q.    So two things you've described in one answer.  I want to

16 go over them one by one.  What did Metro request from the

17 treating expert endocrinologist at Vanderbilt for Cory to

18 enable you to make a sound decision on whether or not to

19 disqualify him?  What did they ask Dr. Fowler for?

20 A.    We asked for all medical records that were pertinent to

21 his diabetes.

22 Q.    Did he comply?

23 A.    Actually, no.  We would have expected to see logs of --

24 you know, if he had daily logs or such in his possession, we

25 would have expected to see those also.

1  Q.    You did not read, Dr. Wright, where Dr. Fowler had

2  faithfully interposed all of his blood glucose records from

3  his glucometer into a computer and put them on a spreadsheet

4  for your review?  You did not --

5  A.    I never seen anything like that.

6  Q.    I know you haven't, but you claim that Dr. Fowler had

7  not provided you or made accessible to you all of this

8  gentleman's blood glucose records.  And I'm asking you before

9  this jury, do you deny under oath, sir, that Dr. Fowler

10 referenced blood glucose values that were downloaded from the

11 glucometer, downloaded into the physician's computer and

12 placed on a spreadsheet?

13 A.    I don't deny that he may have had them.  I deny that I

14 received them.

15 Q.    Right.  And you can affirm in front of this jury, can

16 you not, sir, that you never asked Dr. Fowler for that

17 spreadsheet or one whip of evidence about this man's realtime

18 blood glucose management, did you?

19 A.    We asked for his records inclusive.

20 Q.    Right.  And his records shared with you that he had a

21 spreadsheet with all of the blood glucose values over a

22 course of months; correct?

23 A.    I don't know.  I never saw it.

24 Q.    You saw what Dr. --

25 A.    I saw what Dr. Fowler told me.

Q.    Right.  And he told you he had this data.  And we
established a moment ago you never asked for it; right?
A.    No, I said that we had asked for all records.
Q.    Let's get the chronology here.  You requested from
Dr. Fowler information; right?
A.    I did.
Q.    He provided information that this patient had brought in
his glucometers, downloaded the results, and that the
physician had recorded them on his computer.  Isn't that what
Dr. Fowler told you in writing?
A.    It is.
Q.    It's a fact, is it not, sir, that you didn't ask
Dr. Fowler for those records once you had received his answer
to your question?  Isn't that true, sir?
A.    I don't believe that's the case.  We asked for all
records, and we would have expected inclusive of those, of
some sort of a print-out of those.
Q.    But when he told you he had them on the computer, you
never asked for them; right?  And you never picked up the
phone to talk to him either, did you?
A.    I didn't talk to him.
Q.    Okay.  I want to make sure that we get the chronology
here right.  You were the person at Metro that medically
disqualified Cory Blankenship from consideration; right?
A.    Yes.

1  Q.    Okay.  And the precise reason for your decision to
2  medically disqualify him is that Cory could not produce four
3  A1C lab tests taken at quarterly intervals during the
4  previous 12 months; correct?
5  A.    That was part of the reason, yes.
6  Q.    Well, that was the only reason, wasn't it?
7  A.    Well, we had no proof of how controlled Mr. Blankenship
8  was or wasn't, and those four quarterlies would have helped
9  to provide some insight into how well-controlled he may have
10 been.
11 Q.    Dr. Wright, the only way you can say that is by ignoring
12 every word of what Dr. Fowler told you, isn't it?
13 A.    I had no objective evidence.
14 Q.    You don't consider all of the blood tests, all of the
15 myriad of tests that he submitted as objective evidence?
16 A.    I would if I had actually seen those.
17 Q.    And whose responsibility is it, Dr. Wright, that once
18 Dr. Fowler shared with you that he had all of the blood sugar
19 levels in a spreadsheet for your not asking for them and once
20 you knew those objective measurements existed?
21 A.    I don't know that he specifically -- ask the question
22 again, if you wouldn't mind.  I want to make sure that I'm
23 answering what you want.
24 Q.    Well, it's not so much what I want.  I'm just trying to
25 get at the truth, but I'm trying to understand about

1  Dr. Fowler.  What reason was there, once you knew he had

2  objective data, such as a spreadsheet of glucometer results,

3  why you didn't just ask for them if they were important to

4  you?

5  A.    I didn't know that they were glucometer results, I don't

6  believe.  I think he just marked that he had a log.

7  Q.    Okay.  I know you're an occupational medicine physician,

8  but you know even as an occupational medicine physician that

9  a way for a patient to measure their blood glucose is by

10  using a glucometer to give them a result in five seconds?

11  You know that, don't you?

12  A.    Yes, I do.

13  Q.    Okay.  And you know there are other ways of measuring

14  blood glucose with continuous glucose monitoring?

15  A.    Yes.

16  Q.    Okay.  All right.  And as I understand what you've just

17  said, you claim you have no memory today of having received

18  information from Dr. --

19  A.    Dr. Fowler --

20  Q.    -- Dr. Fowler?

21  A.    -- I know marked the sheet that he had seen a log.

22  Doesn't say it was electronic or anything else.

23  Q.    You don't think?

24  A.    I don't think so.  On the form that he filled out.

25  Q.    We'll talk about that in a moment because I can't find

1  that exact page right here.  But let's go further with
2  respect to that.
3            You do agree, do you not, sir, that Dr. Fowler
4  cleared him for unlimited duty as a firefighter for the
5  Nashville Fire Department; right?
6  A.    I am aware of that.
7  Q.    And he filled out the form properly that you asked him
8  to fill out in rendering his judgment that Cory was fit for
9  duty as a firefighter?
10 A.    Yes.
11 Q.    And you asked nothing further from Dr. Fowler, other
12 than what he submitted to you; right?
13 A.    That's correct.
14 Q.    Okay.  And he was, God rest his soul, a board-certified
15 endocrinologist?
16 A.    Yes, sir.
17 Q.    Which you understand endocrinologists are a subspecialty
18 that deals with the endocrine system?
19 A.    They are.
20 Q.    And in the information that was submitted to you by
21 Dr. Fowler, it documented his history of blood glucose
22 management; correct?
23 A.    That is correct.
24 Q.    His current stability of his blood glucose values;
25 right?

1  A.    Yes.

2  Q.    He offered his judgment that Cory was not at significant

3  risk for hyperglycemia or hypoglycemia, didn't he?

4  A.    I believe he did, yes.

5  Q.    He affirmed to you that Cory was a motivated patient

6  with knowledge of diabetes and its management; correct?

7  A.    Yes.

8  Q.    And at the end of all that, he certified on the form you

9  gave him that he was fit for duty; correct?

10 A.    He did.

11 Q.    And then above and beyond that, Dr. Wright, when it got

12 to the appeal of your decision at the civil -- is it called

13 the Civil Service Commission?

14 A.    It is.

15 Q.    He then wrote another letter to Metro, did he not?

16 A.    He did.

17 Q.    In all of the information he submitted to Metro,

18 Dr. Fowler affirmed that Cory was fit for duty, didn't he?

19 A.    He affirmed.  His records did not -- had me -- had some

20 concern when I received those records.

21 Q.    Let me -- do you remember what my question was?

22 A.    You asked -- the answer to the question you asked would

23 be yes.

24 Q.    Thank you.

25          THE COURT:  All right, why don't we do this, I

1 think we should break at this time today, and we'll pick back
2 up tomorrow. Folks, please do remember my admonition about
3 no discussing of the case with folks. You know, if you want
4 to, you know, tell someone that you spent your day on jury
5 duty, that's one thing. Beyond that, no talking about the
6 case with anybody or doing your own research or
7 investigation, looking things up on the internet, none of
8 that. So we appreciate following that instruction.
9                Please be back in the jury assembly room tomorrow
10 by 9 a.m. And as I say, we'll go until 4:30 again tomorrow.
11                Thanks for your service. And you may step down.
12                (The jury was excused from the courtroom at
13                 4:34 p.m.)
14
15                (End of requested portion.)
16
17
18
19
20
21
22
23
24
25

1    <u>REPORTER'S CERTIFICATE</u>

2         I, Patricia A. Jennings, Official Court Reporter

3  for the United States District Court for the Middle District

4  of Tennessee, with offices at Nashville, do hereby certify:

5         That I reported on the Stenograph machine the

6  excerpt of proceedings held in open court on May 10, 2022, in

7  the matter of CORY BLANKENSHIP vs. METROPOLITAN GOVERNMENT OF

8  NASHVILLE AND DAVIDSON COUNTY, TENNESSEE,

9  Case No. 3:19-cv-00146; that said excerpt of proceedings in

10 connection with the hearing were reduced to typewritten form

11 by me; and that the foregoing transcript (pages 1 through 28)

12 is a true and accurate record of said excerpt of proceedings.

13         This the 8th day of October, 2022.

14

15

16

17

18                    /s/ Patricia A. Jennings
                      Patricia A. Jennings, RMR, CRR
19                    Official Court Reporter

20

21

22

23

24

25